SOUTHERN RAILWAY COMPANY *v.* WATTS AND WATTS, AS COMMISSIONER OF REVENUE, ET AL.

ATLANTIC & YADKIN RAILWAY COMPANY *v.* WATTS AND WATTS, AS COMMISSIONER OF REVENUE, ET AL.

APPEALS FROM THE DISTRICT COURT OF THE UNITED STATES FOR THE WESTERN DISTRICT OF NORTH CAROLINA.

SEABOARD AIR LINE RAILWAY COMPANY *v.* WATTS AND WATTS, AS. COMMISSIONER OF REVENUE, ET AL.

ATLANTIC COAST LINE RAILROAD COMPANY *v.* WATTS AND WATTS, AS COMMISSIONER OF REVENUE, ET AL.

NORFOLK SOUTHERN RAILROAD COMPANY *v.* WATTS AND WATTS, AS COMMISSIONER OF REVENUE, ET AL.

APPEALS FROM THE DISTRICT COURT OF THE UNITED STATES FOR THE EASTERN DISTRICT OF NORTH CAROLINA.

Nos. 368, 369, 381, 382, 383. Argued November 22, 23, 1922.—Decided January 2, 1923.

1. The Equality Clause does not require that the methods of assessing and equalizing state taxes on railroads shall be the same as those applied to other classes of property. P. 525.
2. Undervaluation of property for taxation, as compared with valuation of other property of the same class, does not violate the Equality Clause if it is not intentional and systematic. P. 526.
3. The *ad valorem* taxes imposed on complainant railroads, through an application of the unit rule of assessment, under the Revaluation Act of North Carolina, Public Laws 1919, c. 84, do not violate the Due Process or the Commerce Clauses of the Federal Con-

stitution or the true value and uniformity provisions of the constitution of North Carolina, Arts. V and VII. P. 527.

4. Mere errors of judgment upon the part of the assessing authorities are not subject to review in these suits to enjoin the collection of the taxes. P. 527.

5. The North Carolina Revaluation Act, *supra*, though referring to data commonly used in valuing railroads and authorizing the state taxing board to require railroads to furnish such information, did not make mandatory any particular method of valuing railroads, but required the board to exercise an informed and honest judgment in that regard. P. 527.

6. Failure to follow methods referred to in earlier statutes could not render illegal the revaluation of railroads made under that act by the state board in 1920, since such valuation was tentative and became an assessment by the legislature through approval by North Carolina Laws 1920, Ex. Sess., c. 1. P. 528.

7. The state board, though empowered to reduce this statutory assessment, was not required to make a new valuation, or to apply any particular method of valuation. P. 528.

8. The so-called franchise tax imposed for state purposes on railroad companies by North Carolina [Laws 1920, Ex. Sess., c. 1, § 82 (6½); Laws 1921, c. 34,] equal to one-tenth of one per cent. of the value of each company's property within the State, is not an additional property tax, and does not violate the Uniformity Clause of the state constitution or the Equality or Commerce Clauses of the Federal Constitution. P. 529.

9. The aggregate burden imposed by the property tax, the franchise tax, and the income tax does not obstruct interstate commerce. P. 530.

10. Section 82 (3½) of c. 34, North Carolina Laws 1921, has no application to railroads. P. 530.

289 Fed. 301, affirmed.

APPEALS from decrees of District Courts, under Jud. Code, § 266, denying interlocutory injunctions in suits by divers railroad companies to enjoin collection of taxes in North Carolina.

M r. S. R. Prince, with whom Mr. L. E. Jeffries, Mr. W. M. Hendren and Mr. C. O. Amonette were on the briefs, for appellants in Nos. 368 and 369.

*Mr. Murray Allen,* with whom *Mr. Forney Johnston* and *Mr. James F. Wright* were on the brief, for appellant in No. 381.

*Mr. Thomas W. Davis,* with whom *Mr. George B. Elliott, Mr. Harry Skinner* and *Mr. H. W. Whedbee* were on the brief, for appellant in No. 382.

*Mr. W. B. Rodman,* with whom *Mr. C. M. Bain, Mr. John M. Robinson* and *Mr. W. B. Rodman, Jr.,* were on the brief, for appellant in No. 383.

*Mr. James S. Manning,* Attorney General of the State of North Carolina, *Mr. William P. Bynum,* and *Mr. Sidney S. Alderman,* with whom *Mr. Frank Nash, Mr. George H. Brown, Mr. Locke Craig* and *Mr. Thomas D. Warren* were on the briefs, for appellees.

MR. JUSTICE BRANDEIS delivered the opinion of the Court.

These five cases were heard together and present largely the same questions of law. Each is an appeal from a decree entered by a federal District Court for North Carolina under § 266 of the Judicial Code denying an interlocutory injunction. In each a railroad company engaged in interstate commerce seeks to enjoin the taxing officials from collecting the *ad valorem* property taxes for the year 1921, imposed for local purposes, and the franchise tax imposed for state purposes. Some of the corporations plaintiff are foreign; some, domestic. One has its lines wholly within the State; four have lines also in other States. But these differences are without legal significance in this connection. The property taxes are assailed on the ground that, as assessed, they violate the equal protection clause, the due process clause, and the commerce clause of the Federal Constitution, the uniformity provision of the state constitution, and the statutory method of valuation. The franchise taxes are assailed on

the ground that the statute under which they are laid violates the commerce clause, the equal protection clause, and the due process clause of the Federal Constitution, as well as the uniformity clause of the state constitution; that the amounts of these taxes were illegally calculated, in violation of the statutes of the State; and that since they are fixed by a percentage of the *ad valorem* valuations, they must fall because those valuations were illegally made. Many of the objections made raise questions as to the meaning and effect of recent statutes of the State which have not yet been construed by its courts; and we are reluctant to pass upon these questions. Some of the objections raise issues of fact on which the evidence is submitted by affidavit and is in certain respects conflicting. But in all the cases jurisdiction rests upon substantial federal questions. The objections to the validity of the legislation and of the assessments, whether arising out of the Federal Constitution or out of the constitution or statutes of the State, may be presented in a single suit. We must, therefore, determine state, as well as federal, questions. *Michigan Central R. R. Co.* v. *Powers*, 201 U. S. 245, 291; *Greene* v. *Louisville & Interurban R. R. Co.*, 244 U. S. 499, 508; *Davis* v. *Wallace*, 257 U. S. 478. All the objections urged have been considered. We are of opinion that none of them should be sustained. The more important ones will be discussed.

The controversy arose in this way.[1] By the constitution of North Carolina taxation of real and personal property must be uniform and *ad valorem* " according to

[1] See Constitution of North Carolina, Articles V and VII; Laws of North Carolina, 1919, c. 90, Revenue Act, particularly §§ 3, 76, 77, 78 and 82; c. 84, Revaluation Act, particularly §§ 1, 3, 4, 7, 25, 26 and 31; Laws of North Carolina, 1920, c. 1, Adopting Revaluation, particularly §§ 1, 2, 3, 4, 5, 7a, 7b, 7d and 82(6½); Laws of North Carolina, 1921, c. 34, Revenue Act, particularly §§ 1, 2, 3, 26, 76, 77, 79, 79a, 80, 81, 82, 82(1), 82(2), 82(3), 82(3½), 82(4), 82(6), 82(6½),

its true value in money." In the assessments made prior to 1920 nearly all classes of property had been grossly undervalued; but the undervaluation varied greatly in degree. The Revaluation Act of 1919, Public Laws, 1919, c. 84, was passed in order to provide for new and fundamentally changed valuations of all property at full values. The valuation of real estate was to be made by county officials; that of railroad property by a state board under an application of the unit rule; and the assessment so made was to be allocated by the state board to the counties on a mileage basis.[2] By that act the valuations made by these taxing boards were to become effective as assessments only upon approval by the legislature. When so approved, they were to be the basis of the taxation for the years 1920 to 1923 inclusive. Revaluations of real estate and of railroads were made under that act and were approved by the legislature in August, 1920. Public Laws, 1920, c. 1. Through these revaluations the assessments of railroad property were, on the average, doubled, as compared with the assessments prevailing in 1919;[3] and

---

82(7), 82(8), 82(9), 82(10), 82(11), 82(12), 82(13), 82(15), 82(16), 82(17) and 82(18); c. 38, Machinery Act, particularly §§ 28a, 28b, 28c, 28d, 28e, 28f, 28g, 61, 62, 62a, 63, 64 and 65; c. 40, Transferring Powers of State Tax Commission to State Department of Revenue, §§ 1, 2 and 3. Act of Special Session December, 1921, to amend c. 34 of Public Laws, 1921, §§ 1, 2 and 3; to amend c. 38 of Public Laws, 1921; Act of December 19, 1921, to refund tax illegally assessed.

[2] Prior to 1921 railroad property was valued and assessed (apart from the action by the legislature in 1920) by the State Tax Commission. In 1921 the powers of the State Tax Commission were transferred to the Department of Revenue under a Commissioner of Revenue. In this opinion "state board" is used throughout to refer to state authorities as distinguished from county boards which assessed local real estate.

[3] The increases were: Southern Railway $46,869,942 to $96,605,694; Atlantic & Yadkin Railway, $1,975,806 to $4,104,710; Seaboard Railway, $20,191,720 to $34,768,440; Atlantic Coast Line Railway, $34,645,345 to $50,867,800.

those of real estate were quadrupled. The aggregate assessment of all the railroad properties as revalued in 1920 was $250,587,158; the aggregate of the real estate $2,006,124,997; that of the personal property $807,866,-443; and that of industrial and financial institutions $444,748,145.

The relatively larger increase in the revaluations of real estate and of other property resulted in railroad taxes for 1920 lower than had prevailed theretofore; and these taxes were duly paid. But widespread objection to continuing the 1920 revaluations as a basis for the taxation of real estate developed in the latter part of 1920. A severe depression in business had occurred; there was an abrupt decline in commodity prices, particularly farm products; and real estate values were affected by this decline. The legislature, thereupon, made provision, Public Laws, 1921, c. 38, § 28, under which, upon application of taxpayers, the 1920 revaluations of real estate could be reviewed by county boards and those of railroad property by the state board. These boards were authorized to make corrections wherever assessments were found to exceed existing values. By proceedings under the Act of 1921 reductions were made in 67 counties, varying from 1 to 50 per cent. in the valuations of real estate (including that belonging to the railroads not used in the transportation service). In 33 counties no reduction in the valuations of real estate was allowed. The legislature of 1921 had made no provision for reviewing the revaluations of personal property; and the assessments thereon remained unchanged, although the valuations of personalty had also been greatly increased in 1920. Under the Transportation Act, 1920, the Interstate Commerce Commission issued, in the latter part of 1920, orders pursuant to *Ex parte 74, Increased Rates,* 58 I. C. C. 220, raising freight rates in North Carolina 25 per cent. and passenger rates 20 per cent. over those prevailing when the revaluation of 1920

was made.   Thereafter, the five railroads applied to the state board for reduction of their valuations as the basis for taxation in 1921 and subsequent years.   The application of the Norfolk & Southern was granted in part; and its assessment was reduced from $27,023,462 to $22,840,932.   But, after due hearing, and rehearings, the state board refused to modify the assessments of the other four railroads which had been fixed by the legislature of 1920.   Thereupon these suits were begun.

The contention of the railroads that the property taxes as assessed are obnoxious to the Federal Constitution was rested here mainly on the claim that there is a denial of equal protection of the laws.   This claim is asserted on several grounds.   It is contended, in the first place, that the Act of 1921 providing for the review of valuations is void.   The argument is that the railroads were discriminated against, because real estate owners are given an appeal on assessments from the county board to the State Board of Equalization, but that no such appeal is provided from the assessment of railroads.   It is also argued that there is discrimination in this: While c. 38, § 28*g*, provides for reduction by the state board in the valuation of a railroad only where it applies therefor, reductions in the value of all real estate within the county were, under § 28*a*, to be made provisionally, if the county board determined that the 1920 valuation was, as a whole, in excess of a fair value; and that in such event the percentage of the average excess would be applied to each parcel in the county, unless and until the assessment of individual real estate owners should be revised by the State Tax Commission.   The differences in the classes of property, and in the conditions of ownership, obviously made difference in treatment unavoidable.   Differences in the machinery for assessment or equalization do not constitute a denial of equal protection of the laws.   *New York State* v. *Barker,* 179 U. S. 279.

The claim that plaintiffs have been denied equal protection of the laws appears to rest more largely on the charge that discrimination has been practiced against them in administering the tax laws. It is urged that county boards, proceeding under § 28a of the Act of 1921, reduced real estate valuations quite generally, but that the state board, acting under § 28g, refused to reduce the valuation of any railroad except that of the Norfolk & Southern. The rule is well settled that a taxpayer, although assessed on not more than full value, may be unlawfully discriminated against by undervaluation of property of the same class belonging to others. *Raymond* v. *Chicago Union Traction Co.,* 207 U. S. 20. This may be true although the discrimination is practiced through the action of different officials. *Greene* v. *Louisville & Interurban R. R. Co.,* 244 U. S. 499. But, unless it is shown that the undervaluation was intentional and systematic, unequal assessment will not be held to violate the equality clause. *Sunday Lake Iron Co.* v. *Wakefield,* 247 U. S. 350, 353; *Chicago, Burlington & Quincy Ry. Co.* v. *Babcock,* 204 U. S. 585; *Coulter* v. *Louisville & Nashville R. R. Co.,* 196 U. S. 599; *Sioux City Bridge Co.* v. *Dakota County, ante,* 441. Plaintiffs have clearly failed to establish that there was intentional and systematic undervaluation by the county boards. Strong evidence to the contrary is furnished by the fact that in 33 counties, including those in which the largest cities are located, no reduction was made in the valuation of real estate and that in the remaining 67 counties the reduction varied from 1 to 50 per cent. Plaintiffs have failed, likewise, in showing systematic refusal on the part of the state board to allow a proper reduction in the valuation of any railroad. The further contention that by reduction of the Norfolk & Southern's assessment the other plaintiffs were discriminated against is also unfounded.

The claims that the assessments made by the legislature in 1920 violate the due process and commerce clauses of the Federal Constitution and the true value and uniformity clauses of the state constitution, rest largely upon the contentions that the valuations were made on wrong principles and are excessive. There was ample opportunity to be heard; and the opportunity was availed of. There is no suggestion of bad faith. At the most there have been errors of judgment; and mere errors of judgment are not subject to review in these proceedings. *Pittsburg, Cincinnati, Chicago & St. Louis Ry. Co.* v. *Backus,* 154 U. S. 421; *Brooklyn City R. R. Co.* v. *New York,* 199 U. S. 48, 52. There was no taxation of interstate commerce. *Postal Telegraph Cable Co.* v. *Adams,* 155 U. S. 688; *Western Union Telegraph Co.* v. *Taggart,* 163 U. S. 1. There is not shown any taxation of property without the State as in *Wallace* v. *Hines,* 253 U. S. 66. Because these several constitutional objections are, in our opinion, unfounded, we do not deem it necessary to consider the contention of defendants that there was open to plaintiffs the opportunity of reviewing the assessments in the state courts by writ of certiorari, and that, unless and until such remedy had been exhausted, there was no right to seek relief by these bills in equity. See *Keokuk & Hamilton Bridge Co.* v. *Salm,* 258 U. S. 122, 125.

The claim that the railroads' property taxes are void under the statutes of the State seems to rest, in the main, on the charge that in valuing them in 1920, and in passing upon the application for reduction under the Act of 1921, the state board failed to follow the method of valuation prescribed. It is argued, among other things, that there was no separate assessment of tangible and intangible property; or if so, that plaintiffs were not notified as to what that separation was; that there was no due consideration of the actual cost of replacement of the property, with just allowance for depreciation of rolling stock; that

the franchise or intangible value was not assessed by a due consideration of the gross earnings as compared with operating expenses, or of the market value of the stocks and bonds; that the particular method prescribed by the statutes for assessing interstate roads was not followed; and that erroneous methods of valuation were adopted. To these contentions there appear to be several answers. The Revaluation Act did not make mandatory any particular method of valuation. The legislature recognized that the difficulties inherent in valuing a railroad are great. It desired that the valuers should have access to every fact which might aid them in performing their duty. The data concerning the railroads referred to in the act, like the methods of valuation referred to in earlier and later legislation, are among those commonly used when an attempt is made to ascertain the value of a railroad. But they are merely aids. Such data are commonly in the possession of the railroad companies; and are often not readily accessible to others. The legislature by the Revaluation Act authorized the state board to require the railroads to furnish the information. But it did not undertake to prescribe to what extent or how the information should be used by them. Their duty was merely to exercise an informed and honest judgment in fixing values for purposes of taxation. Compare *Minnesota Rate Cases,* 230 U. S. 352, 434. Another answer to plaintiffs' contention is that mere failure to follow methods of valuation referred to in earlier statutes could not, in any event, render illegal the revaluation made by the state board in 1920; since it was, by the Revaluation Act, made tentative merely. That tentative valuation became an assessment by the legislature, and, hence the law, through approval by c. 1, Laws Extra Session, 1920, which made it the assessment for the next four years. The state board, when applied to in 1921, had power to reduce the statutory assessment; but in acting on the applications it was not,

as we read the statutes, required to make a new valuation, or to apply any particular method of valuation.[4]

The railroad franchise tax, equal to one-tenth of one per cent. of the value of the company's property within the State, is imposed wholly for the support of the state government. Such taxes are expressly authorized by the state constitution, Article V. Before 1920 the contribution of railroads toward the expenses of the state government was made partly by a small privilege tax dependent on gross earnings per mile, partly from a percentage of the *ad valorem* property tax paid by them; and in valuing railroad property there was included among the intangibles what is frequently called the franchise or the corporate excess. In 1920 this mileage privilege tax was abolished; payment for general state purposes of a percentage of the property tax was discontinued; and by § 82 (6½) of c. 1, Laws Extra Session, 1920, and Revenue Act

---

[4] The following statutory provisions show that no assessment was made by the State Tax Commission in 1920 or 1921 or by the Commissioner of Revenue in 1921, but that the assessment was made by the legislature in 1920. The only power of the Commissioner of Revenue in 1921 was to make reductions in certain cases.

Revaluation Act, Public Laws, 1919, c. 84, § 6, provided that all real property should be valued as of May 1, 1919, and such value should be used for all tax purposes for 1920, 1921, 1922, and 1923. Section 31 provided for a complete revaluation of all railroad companies to be used as the basis for computing taxes for such companies for 1920, 1921, 1922 and 1923. Section 3 provided that the assessment made under said act was not to be used as a basis for computation of taxes until it had been approved by the legislature.

Act of Special Session, 1920, c. 1, § 1, approved the " assessment or valuation " made under Revaluation Act of 1919 and adopted it as the basis for levy of tax rates by the State and all subdivisions thereof for 1920, and the valuation of real property so fixed was adopted for 1921, 1922 and 1923, " except as such valuations may be hereafter changed according to law."

Machinery Act, Public Laws, 1921, c. 38, § 64, provided for the valuation of railroads (laying down rules therefor) " at such dates as real estate is required to be assessed for taxation."

of 1921, c. 34, the so-called franchise tax here in question was imposed. It is argued that this franchise tax is an additional property tax which is not imposed on others, and that, consequently, it violates the uniformity clause of the state constitution and the equal protection clause of the Federal Constitution. It is true that the franchise tax is measured by the value of property already subjected to the *ad valorem* tax. But a privilege tax is not converted into a property tax because it is measured by the value of property (compare *Clark* v. *Titusville,* 184 U. S. 329, 333, 334); nor by the fact that in this measure is included property not used in the transportation service. Railroads differ in so many respects from other properties that they may, as a class, be taxed differently or additionally, if that is not inconsistent with the constitution of the State.

Nor is there any basis for the claim that the franchise tax act violates the commerce clause. The tax appears to be upon the privilege of doing an intrastate business. Compare *Armour Packing Co.* v. *Lacy,* 200 U. S. 226. It is not of the character which is held a burden upon interstate commerce. *St. Louis Southwestern Ry. Co.* v. *Arkansas,* 235 U. S. 350; *Underwood Typewriter Co.* v. *Chamberlain,* 254 U. S. 113, 119, 120; *St. Louis-San Francisco Ry. Co.* v. *Middlekamp,* 256 U. S. 226. Payment of the tax is not made a condition precedent to granting a railroad permission to do interstate business. Compare *Leloup* v. *Mobile,* 127 U. S. 640. *Underwood Typewriter Co.* v. *Chamberlain,* 254 U. S. 113, 119. And there is no basis for the contention that the aggregate burden imposed by the property tax, the franchise tax, and the income tax, operates to obstruct interstate commerce.

The remaining objections to the franchise taxes relate merely to the amounts at which they are calculated. It is insisted that § 82 (3½) of the Revenue Act of 1921 applies, and that therefore upon the facts stated the tax should be for one-twentieth, not for one-tenth, of one per cent. of the value of the company's property within

the State. The Norfolk & Southern, insisting likewise that the section applies, argues that the taxes assessed upon others thereunder would be only one-half the percentage it is required to pay, and, therefore, contends that the act denies to it equal protection of the laws. Upon this question of statutory construction the courts of the State have not yet passed. The taxing officials insist that § 82 (3½) has no application to railroads; and in support of their contention point to the history of the legislation. We think that they are right.

A further objection peculiar to the Atlantic & Yadkin Railway should be mentioned. This road is located wholly within North Carolina. Its entire capital stock is owned by the Southern; and it is operated as a part of the Southern System. The state board assessed all the lines operated by the Southern System at $101,960,413, and then apportioned to the Atlantic & Yadkin the sum of $4,104,710, a sum alleged to be grossly excessive. Defendants aver that the amount represents the actual value of the property. They say, further, that the apportionment was made in accordance with the plan suggested by the tax commissioner of the Southern System; that neither the Southern Railway nor the Atlantic & Yadkin was, in any way, prejudiced by assessing the property together; or by allocating this amount to the latter; that if the Atlantic & Yadkin was overassessed, the Southern was, to that extent, underassessed; and that the company is estopped by its conduct from questioning the assessment on this ground. A doubt is raised whether the taxes assessed upon this plaintiff should be sustained. But even if the objection can be availed of in this suit, the state of the record is not such as to justify us in reversing, on this ground, the decree denying an interlocutory injunction to the Atlantic & Yadkin. It will, of course, be open to this plaintiff to renew the objection upon the final hearing.

*Affirmed.*