**GREAT NORTHERN RY. CO. v. WEEKS, State Tax Com'r, et al.**

No. 10221.

Circuit Court of Appeals, Eighth Circuit.

April 25, 1935.

Rehearing Denied May 24, 1935.

F. G. Dorety, of St. Paul, Minn. (C. J. Murphy, of Grand Forks, N. D., on the brief), for appellant.

Harold D. Shaft, of Grand Forks, N. D. (P. O. Sathre, of Finley, N. D., on the brief), for appellees.

Before STONE, SANBORN, and FARIS, Circuit Judges.

STONE, Circuit Judge.

The Board of Equalization of the State of North Dakota made an assessment of the property of appellant in August, 1933, under statutes requiring such assessments to be at the "true and full value in money." The result of this assessment was allocated to the various counties containing mileage of the railway and such allocated amounts were certified to the auditors and treasurers of such counties. Appellant filed this suit in the District Court for the District of North Dakota against the State Tax Commissioner and the auditors and treasurers of these several counties whereby it sought to enjoin the collection of 43 per cent. of the taxes based upon such assessment on the ground that the assessment was invalidly

excessive to that extent. Appellant paid something more than the amount of taxes it deemed to be due; issues as to the validity of the assessment were joined; a full hearing was had; and the court made findings and entered a decree dismissing the bill for want of equity. From such decree this appeal is brought.

Appellant presents here two main contentions. Both of them are based on the proposition that the assessment is grossly excessive. The first contention is that this excess is caused by including within the assessment property outside of the state of North Dakota. The second is that the excess was occasioned by the arbitrary action of the board.

### I. Out-State Property.

Not every excessive state assessment of property which is a part of interstate property permits the issue that the assessment results in taxation of out-state property. That issue is open only where it is established that the assessment value was reached by the use of certain methods or formulæ and that such use has resulted in inclusion of out-state property. Such methods and formulæ are those having to do with allocation of state value from system value. Two successive steps are thus involved in such a contention: First, establishment that certain methods or formulæ were used by the assessing officials; second, that the use of such methods or formulæ resulted in the inclusion of out-state property in the value assessed within the state.

The trial court expressly found: "That at no time within the past ten years has the State Board of Equalization adopted any specific or definite formula or method of calculating the value of the railroads operating in the state of North Dakota, but the State Board of Equalization has at all times had before it, at the time of making such assessments, tables and formulas prepared by the railroads and the office of the Tax Commissioner of the state, and has considered the same in arriving at its assessments, but never has adopted the exact result of any of said tables, formulas or methods of computation of railroad valuations."

If this finding is sustained by the evidence, there is no basis for the issue that out-state property is included in the assessment.

Appellant's contention is that the State Board made no independent determination

of assessment for 1933 but merely adopted the assessment of 1932; that the assessment for 1932 was determined according to a definite method; that such method was as follows:

"The state taxing authorities first determined a value for the entire railroad system including the property located in other states. They capitalized the average net annual earnings of the entire railroad property for the five-year period ending with the year preceding the assessment at the rate of 6% to determine an earnings value of the system. They then determined the average total market price of appellant's outstanding securities (stocks and bonds) for the same period, thus obtaining a total market price of these securities, which represented ownership not only of the railroad property but also of all other assets of the appellant not forming any part of its railroad and subject to local taxation in other jurisdictions. They then apportioned a part of this total securities price to the railroad property alone, this apportionment being made one-half in proportion to relative cost or investment, and one-half in proportion to the respective net earnings of the railroad and non-railroad properties. Having thus determined a 'stock and bond' value for the railroad property alone, they averaged this 'stock and bond' value with the 'earnings' value obtained as above stated, thus determining a system value of the railroad property as of the date of assessment. Of course, this system value included all of the railroad properties of the Great Northern in all of the eight states.

"They then attempted to allocate a portion of this system value to the state of North Dakota upon a composite allocation factor which included the following proportions: 'miles of all track' (single year), 'car and locomotive miles' (five year average), 'ton and passenger miles' (five year average), 'gross revenues earned' (five year average), and 'physical property' (single year). In the 'gross revenues' attributed to the state of North Dakota were included a proportion of the gross revenue on each

interstate shipment or trip performed in any part in North Dakota, equal to the proportion of road miles in North Dakota to the total road miles traversed by that particular shipment. The amount of physical property in North Dakota and on the system was measured by estimated cost of reproduction less depreciation. An average of these five factors was applied to the system value to produce a value for North Dakota, and the State Board of Equalization then adopted a 'judgment' figure approximating but not conforming identically to it."

Appellant contends that the answer does not deny, and therefore admits, that the above method (pleaded in the complaint) was the one used by the board. The answer very clearly denies that such method was the sole basis of the board's determination. In several places in the answer it appears that, in reaching its conclusion in 1933 and prior years, the board had before it computations based on the above five elements and on various combinations of those elements and:

"That upon this evidence and upon all other evidence and matters of common knowledge before it the board did in the year 1932 fix the valuation of plaintiff's property in North Dakota at $78,850,024.00.

"Defendants further allege that in the year 1933 the State Tax Commissioner and the plaintiff did present to the State Board of Equalization the financial and operating statistics of the plaintiff's railroad and reports and computations based upon the formulas used in 1932 and other evidence of value, and that the Board of Equalization after full consideration of said statistics, computations, reports, and all other evidence of value and matters of common knowledge, did fix the assessment of plaintiff's property in North Dakota for the year 1933 at $78,-832,888, which said amount represented the honest judgment of the State Board of Equalization and the true and full value of the plaintiff's North Dakota property in money." [1]

These pleadings definitely presented the issue as to what extent the board used the method declared in the petition or any other

[1] Other allegations in the answer are as follows:

"That the law above stated applies to the State Board of Equalization as well as assessors. The State Board of Equalization is thereby [section 2122 Supplement to Compiled Laws of North Dakota, 1913–1925] required to exercise its best judgment and discretion as to the assessment of operating property of railroad companies and is required to assess such property at such amount as the board believes such property to be fairly worth in money. Said law does not permit the State Board of Equalization to substitute for statutory and constitutional provisions, requiring the board to exercise its judgment and discretion as to value, any

method. This leaves the solution of the issue to the evidence.

In its brief appellant states: "While the Board of Equalization did not adopt this computation exactly but also considered computations made by the use of only a portion of the five allocation factors mentioned above (which produced even higher results for North Dakota) and also 'other evidence and matters of common knowledge' (T. 27), the assessment which it adopted approximated all of these computations and was slightly in excess of the computation produced by the five factor ratio which the state alleges to be the fairest one. It seems fair to conclude, therefore, that the method outlined above was the basis upon which the assessment was made, or at least that any errors which we can point out in the method described above are reflected in the assessment, in somewhat exaggerated form."

From this quotation, it is clear that the proof of the *fact* that the board used the above five factor method is based on the *conclusions* that because the board's assessments for several years before 1933 were not far from what would have resulted by the use of that method and because the assessment of 1933 was the same as for 1932, it must follow that such method was carried into the 1933 assessment. But the 1933 assessment is appreciably above the result which would have been reached by applying such method. No member of the board was a witness. No witness pretended to know all that the board might have considered. Witness Baker (who had nothing to do with this 1933 assessment but who was, until January, 1933, Deputy Tax Commissioner for North Dakota and who prepared valuation data for the Tax Commissioner to present

---

arbitrary formula, method or rule based upon operating and financial statistics of railroads. * * *

"The State Board of Equalization of the State of North Dakota and the taxing authorities of other states have used and considered said formulas based upon the operating and financial statistics of railroads as evidence of the value of railroads but not as the exclusive source of evidence of value. * * *

"Defendants allege that the State Board of Equalization pursuant to its constitutional and statutory duty considered the financial and operating statistics of the plaintiff and the computations of value based upon the accepted formulas together with all other evidence before it and matters of common knowledge including the conditions of the times and from all such evidence arrived at the assessment herein complained of as its honest judgment as to the full and true value of the plaintiff's property in North Dakota in money. * * *

"Defendants further allege that all of the statistics, formulas and computations and all other evidence and matters of common knowledge were considered by the board in arriving at its 1933 assessment. * * *

"Answering paragraph XVIII of plaintiff's complaint, defendants deny that the Board of Equalization deliberately, intentionally, or knowingly over-valued or over-assessed plaintiff's property or ignored any of the facts, figures or computations material to a determination of the value of plaintiff's property, and deny that any value of property located in other states was assessed in North Dakota, and deny that the board acted without

logical processes of reasoning or basis of fact, and deny that said assessment was made arbitrarily, fraudulently or excessively and on the contrary these defendants allege that said assessment for 1933, and for all prior years, was made after full and fair consideration of all the facts herein set forth and of all other facts material to a determination of the value of plaintiff's railroad and that the assessment made in 1933 represented the honest, fair, and just determination of the Board of Equalization.

"Defendants allege that under the recognized, accepted and usual methods of ascertaining railroad values, the assessment for the year 1929 was approximately 100% of full and true value, for 1930 was approximately 96% of full and true value, for 1931 was approximately 96.5% of full and true value, and for 1932 was 100.3% of full and true value, and that the apparent over-assessment for the year 1933, if computed strictly upon the arbitrary formulas hereinbefore referred to is occasioned by the fact that the application of the arbitrary formulas hereinbefore referred to had lost most of their evidentiary value by reason of the panic conditions existing in 1933 as hereinbefore referred to, and that in order to arrive at any honest, fair, or just determination of the value of plaintiff's property in 1933 it was necessary to add to the results produced by such arbitrary formula large amounts in order to compensate for the artificially and unnaturally low prices of stocks and bonds as hereinbefore alleged, and for the temporary effect upon plaintiff's net earnings of the collapse of business generally throughout the world."

to the board up to the time), testified as follows:

"The State Board of Equalization in North Dakota in deliberating on railroad assessments considered the evidences of value as presented in the briefs of the railroad companies and the evidences of value as shown in exhibits prepared by the Tax Department for their use and just what their final conclusions as to the assessments were, were, I believe, based upon their judgment in part and in part upon what the statistical data that they considered indicated. * * *

"The formulas that I have used in this case to a great extent are the ordinary and usual formulæ that have been given recognition either by the courts or are in general use by taxing bodies, and the State Board of Equalization gave such weight to the data as the Tax Commissioner presented to the board as in their judgment it was entitled to. I cannot give any testimony as to just what weight was given to the evidence presented to them. There were two classes of evidence, that presented by the Tax Commissioner and that presented by the Railway Company. * * *

"In presenting these exhibits and tables, it has not been my intention to state that any of these formulæ produced a true valuation of the Great Northern Railway. My purpose has been to show that by the use of most any formula that has been given any recognition the assessment in the four years immediately preceding 1933 could be justified and then I have shown what results were produced for the year 1933 by each method.

"As to my statement that the excess in the 1933 assessment over the results produced by any of these tables operated to some extent to condemn the 1933 assessment, I will say that the very best statistical evidence of value are not definite proof of value and there were a number of peculiar and extraordinary circumstances for the board to consider in 1933 that are not in any way indicated by statistical exhibits. I do not feel that variance from the results produced by my table present an absolute showing of a wrongful assessment on the part of the State Board.

"When I say that the State Board of Equalization had unusual facts and circumstances before it in 1933, I refer to two different things, first, the general economic situation, not only in the United States, but particularly in the state of North Dakota, with an almost total collapse in the value of all property and with almost a total collapse in the income producing ability of property not only in North Dakota but generally; and the second matter to which I refer was the fact that in 1932 the people of North Dakota by an initiated law changed the tax base from 75% of full value to 50% of full value. Due to the various tax limitation laws limiting the tax levies of all classes of taxing districts this handicapped the various equalization boards and particularly the State Board of Equalization in reducing property values down to correspond to some extent to the drop in income and corresponding to the actual loss in value which had occurred. The tax base had been more than cut in two in a few years. In 1923 the tax base on a 75% valuation was approximately a billion and eighty-nine million. This had gradually shrunk and then was decreased by one-third in 1932 by reasons of the initiated law, and the various taxing districts, counties and school districts, to a very large extent, were unable to levy sufficient revenue under the new tax base to meet ordinary running expenses.

"Referring to my statement that in computing the stock and bond values of the railroad, the state of the market during the portion of the year 1933 preceding the meeting of the Board of Equalization had not been taken into consideration, I will say that the three months preceding the date of the assessment or four months, showed a tremendous upward trend in the stock and bond market and we were in the middle of a boom during the months of May, June and July. When I speak of the stock and bond market, I include all stocks and bonds. There was a very sharp rise in Great Northern stock. I don't recall the extent of that rise."

No other witness pretended to say what method or methods the board had used or to what extent it had used any of them. We think appellant has failed to establish that the board was guided by or was largely influenced by the use of any particular method and, therefore, is in no position to urge the contention that property outside the state has been brought into this assessment.

Even had appellant shown such reliance by the board upon the five factor method, it would be in no position to take advantage of such in connection with *this* contention. The force of its attack upon that method is based upon the argument that, in the situation here, the only approximately true

method of allocation was one using the comparative "expense of operation" in North Dakota and outside of that state or upon the system. Appellant presented the five factor method to the board. It is undisputed that no such method as now advanced was ever presented to the board in this matter or in any other. In fact, this method has never been used by any railroad or tax commission so far as any of the witnesses knew and it was prepared subsequent to the making of this assessment. Certainly, this assessment should not be overthrown for a reason which the board never heard of. More strongly is that true when (as shown by this evidence) there is grave doubt as to the verity and usefulness of the method now advanced.

## II. Arbitrary Assessment.

This contention is that even if the method of allocation of state value from system value is defensible and no out-state property has been included in the assessment, yet the board has valued the property of appellant within the state "at a grossly excessive result by wholly arbitrary methods." The position of appellant is expressed in the brief thus: "We believe that the excessiveness of the assessment coupled with the fact that the value was not computed as of that time but was adopted as of a previous year, is sufficient to condemn the assessment; but if not, we believe that the methods which were used in making the 1932 assessment make it wholly inapplicable and arbitrary for 1933."

In view of much of the argument of appellant (hereinafter to be examined), it is vital to keep in mind that not only was the burden upon appellant to prove both excessive assessment and arbitrary action in reaching such result, but, since this litigation involves the validity of state action, to prove such clearly and convincingly—there was no burden upon appellees to sustain the action of the board. When the validity of state action is in controversy, it is the duty of courts to view the testimony critically from the sole standpoint of how completely and convincingly the challenger of such action has sustained his position. From this standpoint we are compelled to view this evidence.

While appellant presents its supporting argument under several headings, it is all based upon two matters: That the 1933 assessment is the same as that for 1932, and that it is excessive. From the fact that the assessments of these two years are identical, appellant argues that no independent investigation or consideration was given to the situation existing at the time of the assessment for 1933 (August, 1933) but that the board reached its conclusion upon the same basis, methods and facts as in 1932. The argument really is that because none of the calculations of the appellant or of the Deputy Tax Commissioner justified the result reached by the board and because the assessment was the same as in 1932, that the board gave no weight or consideration to the situation and matters before it in 1933 and arbitrarily selected the assessment for the year 1932. No such assumption necessarily follows: It may have been true or it may not. It was for appellant clearly to establish that it was true. Appellant urges that this conclusion must be accepted because appellees did not deny these matters in the pleading nor did they meet them in the proof by placing the members of the board on the stand and from them disclose what they actually did. Certainly there is no such admission in the answer. The issue was directly presented in the pleadings. Nor is any strength to be gained from appellees not putting the board members on the stand. No burden of proof rested on appellees. No inference unfavorable to appellees can be drawn from such action since the board members were, if proper witnesses, as available to the appellant as to appellees. The burden of clearly proving its case remained with appellant from the beginning. It could stop when it felt it had sufficiently established its case. If it closed before it had reached that point and has failed to introduce evidence known to exist it cannot have advantage therefrom where the evidence is open to it to produce.

The evidence reveals the following: That the board had before it data and calculations, by various methods, presented by appellant which referred to the 1933 assessment; that in *prior* years, calculations by various methods prepared by the deputy Tax Commissioner had been before it; that before 1933, it had "used" the five factor method (to what extent or just how does not appear); that the assessments of former years had never tracked any of the known methods; that, measured by any of the methods, the assessments for 1929 were approximately 101 per cent., for 1930 approximately 96 per cent., for 1931 approximately 97 per cent. and for 1932 approximately 101 per cent.; that, by any of the methods, the assessment for 1933 was from 115.27 per cent. to 121.72 per cent.; that since 1918,

the movement of annual assessments of appellant's property by the board had been as follows, in 1919 a reduction of 4 per cent. ($3,683,000), in 1921 a reduction of 5 per cent. ($4,332,252), practically no change until 1929 when an increase of 1.25 per cent. ($1,028,291), no appreciable change in 1930, in 1931 a reduction of $294,691, in 1932 a reduction of 5 per cent. ($4,149,973), in 1933 no change; that no formula nor combination of formulæ has been found to be an accurate measure of value; that formulæ are merely methods worked out to aid in solving the difficult matter of value; that there is decided difference of opinion between students of values as to the relative worth of different formulæ and as to their use in different situations; that there is no evidence of any deliberately arbitrary or wrongful assessment concerning years prior to 1933; that there is no evidence of what use was made by the board of any formula either in 1933 or prior years; that there is no evidence as to how the board reached its results in 1933 or prior assessments.

The value of anything is, in its nature, a matter of opinion. Where the value involved is market (or sales) value, the determination of such opinion may be accurately made, where the thing to be valued is bought and sold on an active recognized market by current prices in sales on such market. Where the thing is not such as is sold on an active recognized market but is the subject of sale (such, for example, as real estate), determination of opinion as to value is rarely subject to accurate demonstration but must be the result of the judgment (of the trier of the fact of value) applied to various and usually inharmonious evidences and also expressions of expert opinion presented to it. Where the thing to be valued is rarely or never the subject of sale (as here), the task of determining value reaches the limit in difficulty, complexity, and uncertainty. This difficulty appears in this evidence, is expressly stated by the witnesses, and it has been universally recognized by courts. The most recent judicial announcement thereof is contained in a fine, concise statement (with a wealth of citations) by Mr. Justice Butler in Rowley v. C. & N. W. Ry., 293 U. S. 102, 109, 55 S. Ct. 55, 58, 79 L. Ed. ——, as follows: "The ascertainment of the value of a railway system is not a matter of arithmetical calculation and is not governed by any fixed and definite rule. Facts of great variety and number, estimates that are exact and those that are approximations, forecasts based on probabilities and contingencies have bearing and properly may be taken into account to guide judgment in determining what is the money equivalent—the actual value—of the property. Boom Co. v. Patterson, 98 U. S. 403, 407, et seq., 25 L. Ed. 206; Cleveland, C., C. & St. L. Ry. Co. v. Backus, 154 U. S. 439, 445, 14 S. Ct. 1122, 38 L. Ed. 1041; Adams Express Co. v. Ohio State Auditor [Simpson v. Shepard] 166 U. S. 185, 220, 17 S. Ct. 604, 41 L. Ed. 965; People of State of New York ex rel. Brooklyn City R. Co. v. New York, 199 U. S. 48, 52, 25 S. Ct. 713, 50 L. Ed. 79; Omaha v. Omaha Water Co., 218 U. S. 180, 202, 203, 30 S. Ct. 615, 54 L. Ed. 991, 48 L. R. A. (N. S.) 1084; Minnesota Rate Cases, 230 U. S. 352, 434, 454, 33 S. Ct. 729, 57 L. Ed. 1511, 48 L. R. A. (N. S.) 1151, Ann. Cas. 1916A, 18; Branson v. Bush, 251 U. S. 182, 185–188, 40 S. Ct. 113, 64 L. Ed. 215; Southwestern Bell Tel. Co. v. Pub. Serv. Comm'n., 262 U. S. 276, 287, 43 S. Ct. 544, 67 L. Ed. 981, 31 A. L. R. 807; United States v. New River Collieries, 262 U. S. 341, 43 S. Ct. 565, 67 L. Ed. 1014; Brooks-Scanlon Corp. v. United States, 265 U. S. 106, 123–126, 44 S. Ct. 471, 68 L. Ed. 934; Standard Oil Co. v. Southern Pacific Co., 268 U. S. 146, 155, et seq., 45 S. Ct. 465, 69 L. Ed. 890; McCardle v. Indianapolis Water Co., 272 U. S. 400, 410, 414, 47 S. Ct. 144, 71 L. Ed. 316; Olson v. United States, 292 U. S. 246, 255 et seq., 54 S. Ct. 704, 78 L. Ed. 1236. The apportionment of system value between Wyoming and the rest of the system involves the finding of the value of the portion of the railroad that is located in that State. The problem is quite like the ascertainment of the value of the whole. The determination is to be made in the exercise of a reasonable judgment based on facts so pertinent and significant as to be of controlling weight as indications of the value of the property."

Because of the character of the problem of value and the difficulty of its solution, courts have properly concluded that a determination thereof by them—on review—is no more likely to be correct than the result reached by the person or body whose action is under review. In short, they will not substitute their judgment for that of the other. Rowley v. C. & N. W. Ry., 293 U. S. 102, 111, 112, 55 S. Ct. 55, 59, 79 L. Ed. ——. Where the original determination is a legislative function (directly or through administrative agencies created by the Legislature for that purpose), the judicial func-

tion can operate only to keep the exercise of such legislative action within the constitutional legislative limits. Those limits are that the legislative power shall be exercised in good faith, which means an honest effort to reach a right conclusion. It is not enough to show merely that there has (in the opinion of the court) been overvaluation, but it must also be shown that such good faith effort was lacking—that there was "an intention, or the equivalent of fraudulent purpose, to disregard the fundamental principle of uniformity." Rowley v. C. & N. W. Ry., 293 U. S. 102, 111, 55 S. Ct. 55, 79 L. Ed. ——. Moreover, this bad faith (or arbitrary action) must be clearly and convincingly shown. Here, the original determination of this value was properly committed to the board as an administrative agency created by and acting for the Legislature of the state. Without determining that overvaluation is here shown, there remains the question of arbitrary action in reaching the result.

■ With the above principles in mind, it is obvious that the evidence here fails to show arbitrary action upon the part of the board. That the board had some reason for adopting the 1933 value must be taken as true in the absence of clear proof to the contrary. Whether that reason was so flimsy or based upon methods or considerations so shadowy that the result must be held to be arbitrary we cannot conclude from the above evidence which reveals nothing of what influenced the board to its determination.

State action through proper administrative bodies cannot be judicially overthrown upon surmises and deductions but only upon clear evidence compelling adverse judicial conclusions. It is not at all controlling that this assessment does not prove out by any of the formulæ which the experts who use them admit are merely helps in determination of value and not at all definite measurements thereof. However, whether the result reached by the board is materially out of line according to some or any of the methods ordinarily used in estimating value, depends upon choice of various factors—such as percentage employed in capitalizing earnings and the period used to determine an average of annual earnings. Here, appellant contends for a 7 per cent. rate while there is evidence that a 4 per cent. rate would have been justified under conditions existing in 1933. Also, appellant contends for a three-year period for averaging earnings while there is evidence that a five-year period is proper and usually employed and would be particularly applicable here as it would include peak expansion and peak depression years while a three year would unduly accentuate the depression years. While value is to be here determined as of a definite time, yet no wise investor would think of buying the stock or securities of a railroad without giving consideration to its history. The investor buys because of his estimate of the future but that estimate must include the experience of the reasonably near past.

Nor is it determinative that the 1933 assessment was identical with that of 1932. The evidence shows the business depression effective in 1932 and 1933; a decided improvement in stock and bond prices (generally and as to appellant) in 1933 prior to the assessment; and a slight reduction (.35 per cent. or $294,691) in the assessment of 1931 and a substantial reduction (5 per cent. or $4,149,973) in the 1932 assessment. It also appears that it is not unusual for the board to use approximately the same amount for successive years.[2] It may well be, in view of this situation, that the board might honestly deem its reduction of 1932 to have sufficiently taken care of the effect on value of the depression covering 1932 and passing into 1933—especially in view of apparent improvement in conditions in 1933. So far as we are advised there was no contest of the 1932 assessment and we do not understand that the good faith of that assessment is here questioned.

Much learning has been expended by witnesses and by counsel concerning the merits of various methods of estimating system value and of allocation of state value therefrom and also as to the applicability of such methods of allocation to the situation here. This learning is valuable, but until we know what consideration was given by the board to any or all of these methods the matter is academic in this case.

■ Also it is contended that earnings of appellant were "capitalized at an arbitrary

[2] The assessments for 1919 to 1933, both inclusive, being as follows: 1919, $86,603,330; 1920, $86,599,348; 1921, $82,267,096; 1922, $82,267,047; 1923, $82,267,047; 1924, $82,266,895; 1925, $82,266,353; 1926, $82,266,220; 1927, $82,266,387; 1928, $82,266,386; 1929, $83,294,677; 1930, $83,294,688; 1931, $82,999,997; 1932, $78,850,024; 1933, $78,832,888.

and inadequate rate per cent." The contention is that the rate should have been 7 per cent. Such was appellant's evidence but the witness for appellees defended 4 per cent. The evidence shows that this is a matter of opinion depending on various influencing considerations and that competent experts on the stand had considerable to say upon both sides of the dispute. While we might conclude (if we determined the matter) that 7 per cent. was the best rate, this evidence would far fail in establishing that the use of 6 per cent. (or even as low as 4 per cent.) instead of 7 per cent. was clear proof of arbitrary action by the board. This matter is one of fact not properly subject to judicial review. Louisville & N. R. Co. v. Greene, 244 U. S. 522, 542, 37 S. Ct. 683, 61 L. Ed. 1291, Ann. Cas. 1917E, 97.

It is contended that no stock and bond prices of 1932 or 1933 were considered and therefore the action of the board was arbitrary. There is no evidence that such prices were not considered. The statement to that effect is based upon assumptions drawn from the fact that this assessment was identical with that of 1932.

It is contended that the valuation included nonoperating assets not located in North Dakota. The witness for appellees testified: "The State Tax Commissioner has used a composite method of assigning a value to the operating and to the nonoperating property based upon two ratios; the relative book cost of operating and non-operating property is used as one percentage figure and the relative earnings from the two classes of assets for a period of years is used as the other percentage, the two percentages are averaged and the composite percentage is applied to the total stock and bond value and the resulting amount, for instance, as to non-operating property is deducted from the total stock and bond value."

This testimony, which was all upon this matter, would seem to meet this contention and show an effort by the board to exclude all non-operating assets. Other testimony of the same witness makes clear that he had no knowledge of what the board considered in connection with the 1933 assessment (made July, 1933) since he had terminated his connection with the Tax Commission in January, 1933. The just above-quoted testimony must have referred to the time he was familiar with the affairs of the board, which was several months before this assessment. So construed, there is no testimony as to what the board did in 1933 about excluding or including non-operating property.

Appellant argues that its true value has been more than doubled "by the use of the arbitrary and indefensible methods above referred to"—meaning that such doubled value would result: "If the system value of $433,241,000 which formed the basis of the 1932 assessment (and therefore of the 1933 assessment also) were first reduced to $345,-188,820 (the system value computed by Mr. Baker for 1933 in Exhibit P, T. 277), and if Mr. Baker's computation in Exhibit P (which fails by 25% to support the assessment) were corrected by capitalizing earnings for three years instead of five years, and at the rate of 7% instead of 6%; and if stock and bond prices for three years were used instead of five years and apportioned between railroad property and non-operating assets in proportion to their respective five years earnings instead of by the composite ratio reflecting relative investment, the system value through these corrections would be reduced to $204,417,740 instead of $433,241,000 which formed the basis of the state's assessment."

Of course, if it were shown that the true value of appellant's property were doubled in the assessment it would be a very significant and arresting fact. However, this result is reached only by assuming the verity of all the contributing factors just above quoted and all of them are subject to grave question, some of them are disputed in the evidence and others have no foundation in the evidence. We do not mean to say that an assessment might not be so grossly excessive, under all the circumstances shown by the evidence, that it would, if unexplained, be sufficient proof of fraud. There are cases, relied on by appellees, which seem to state that excessiveness, alone and for a single assessment, is not enough but that the fraud must be a consistent or systematic practice. Cumberland Coal Co. v. Board, 284 U. S. 23, 28, 29, 52 S. Ct. 48, 76 L. Ed. 146; Chicago G. W. Ry. v. Kendall, 266 U. S. 94, 96, 45 S. Ct. 55, 69 L. Ed. 183; Southern R. Co. v. Watts, 260 U. S. 519, 526, 43 S. Ct. 192, 67 L. Ed. 375. We hesitate to construe those and other like cases to mean that in no event can bare excessiveness constitute sufficient evidence of fraud to invalidate a particular and single assessment. We rather incline to the view that a bare showing of excessive assessment or of discrimination in assessments is not sufficient to prove fraud but that if such excessive-

ness or discrimination be so gross and glaring as, under all of the evidence, to challenge the conscience of the court, it may be found to be invalid. Whether such construction of the law be accurate is not, however, of importance here because no such character of excess is shown. In this connection it may be remarked that there was no increase in the 1933 assessment over that of 1932; that (while it is by no means conclusive of the accuracy of the 1933 assessment) it is worthy of notice that during the fourteen years preceding this assessment there was only one increase ($1,028,291), which was for the peak expansion year of 1929, while there were four reductions (totaling $12,459,916, of which $4,149,973 was in 1932) and that the average assessment for the four years just preceding 1933, measured by the five factor formula, is 99.07 per cent. of true value (1929 being 101.29, 1930 being 96.25, 1931 being 97.33, and 1932 being 101.40). This history rather suggests serious consideration and an endeavor by the Board to treat appellant fairly than arbitrary and unreasonable conduct.

The decree must be affirmed.

SANBORN, Circuit Judge (concurring).

The power of the federal courts to enjoin the collection of state taxes upon the property of an interstate carrier has been so circumscribed, as pointed out by Judge STONE, in his able opinion, that, although I have no doubt that the property of the appellant in North Dakota was overvalued for tax purposes in 1933, I concur in the conclusion reached in the opinion and the reasons assigned for it. I am not, however, in entire sympathy with the rule which seems to preclude any interference with such overassessments unless it clearly appears that they result from purely arbitrary action or from something akin to fraud. While death from an honest error of judgment may be preferable to death designedly caused, the effect upon the victim is the same. Overtaxation resulting from honest mistake or errors of judgment is as serious as that resulting from fraud, and constitutes just as unreasonable a burden upon interstate commerce. I regard state taxation of interstate carriers as a matter of national concern.

In this case the defendants' own expert states that no method of computation with which he is familiar would produce a value for 1933 equal to that fixed by the State Board. To that extent we have a different situation here than in the Rowley Case. That the value of the portion of appellant's system in North Dakota in 1933, after the appellant had been through three years of depression, even approximated the values of 1928 and 1929 is to my mind inconceivable. Possibly I am substituting my judgment for that of the board, but the Supreme Court in Atchison, Topeka & Santa Fé Railway Co. et al. v. United States et al., 284 U. S. 248, at page 262, 52 S. Ct. 146, 150, 76 L. Ed. 273, referred to a record made in a rate hearing in 1928 as pertaining to a "different economic era," and said: "This is not the usual case of possible fluctuating conditions but of a changed economic level." Certainly no group of men who in 1933 were ready, able, and willing to buy the appellant's system, and who were clothed in their right minds, would have paid, as the result of fair negotiations, any such sum for the portion of the road in North Dakota as was fixed by the board. So that, while I agree that the court below, upon this record, was justified in denying the injunction prayed for, I am suffering from no illusions with respect to the great changes which took place in the value of all railway properties between the years 1929 and 1933. It may be impossible now for the federal courts to grant any relief to interstate carriers from overtaxation possibly resulting from honest mistakes or errors of judgment on the part of the taxing authorities of those states through which their lines run, but I believe that if interstate commerce by rail continues to be unreasonably overburdened with state taxes, either Congress or the courts will find some way to protect it. In this connection, the opinions of Judge Webster in Northern Pac. Ry. Co. v. Adams County et al. (D. C. E. D. Wash.) 1 F. Supp. 163, and of Mr. Justice Brandeis in Nashville, Chattanooga & St. Louis Ry. v. Walters et al., 55 S. Ct. 486, 79 L. Ed. ——, opinion filed March 4, 1935, are of interest.