249 So.2d 908

Joe W. ABBOTT et al., Plaintiffs-Appellees,

v.

Mary Evelyn PARKER, Treasurer, State of Louisiana, et al., Defendants-Appellants (Village of Shongaloo, Intervenor-Appellant, Mrs. Martha G. Robinson, John J. Watermeier, Jr., and August J. La Nasa, Intervenors-Appellees).

No. 51412.

May 25, 1971.

Rehearing Denied June 11, 1971.

Richard C. Cadwallader, Jonathan C. Harris, Curtis K. Stafford, Jr., Baton Rouge, for Joe W. Abbott, Parey P. Branton, Martha G. Robinson and the Village of Shongaloo, plaintiffs-appellees-appellants-respondents.

Bernstein & Bach, Joseph Bernstein, New Orleans, for Intervenor, John J. Watermeier, Jr.

Benton & Moseley, Fred G. Benton, Sr., Fred G. Benton, Jr., Baton Rouge, for amicus curiae.

Lemle, Kelleher, Kohlmeyer, Matthews & Schumacher, Harry B. Kelleher, Durrett, Hardin, Hunter, Dameron & Fritchie, Calvin E. Hardin, Jr., Baton Rouge, Foley, Judell, Beck, Morel & Bewley, Harold B. Judell, Calogero & Kronlage, Pascal F. Calogero, Jr., New Orleans, Melvin Bellar, Asst. Atty. Gen., for La. Stadium and Exposition Dist. Honorable Mary Evelyn Parker, Treasurer, State of La., W. W. McDougall, Commissioner of Administration, State of La., State Bond and Tax Bd. and Louisiana State Bond Commission, defendants-appellees-defendants-appellants.

TATE, Justice.

By resolution of March 18, 1971, the Louisiana Stadium and Exposition District authorized the issuance of $113 million of bonds to construct a domed stadium in New Orleans. The present proceeding and two companion suits [1] attack the validity of this bond issue, as well as of the means used to finance it—a hotel occupancy tax in the two parishes (Jefferson and Orleans) of the district, and a lease from the District to the State. The opponents to

---

[1]. These suits are decided this same day: Branton v. State Bond and Tax Board, 259 La. 313, 249 So.2d 920; Schwegmann v. Parker, 259 La. 315, 249 So.2d 921. Also decided are the four interventions shown by the caption. They were filed in all three suits, by various parties intervening on behalf of the plaintiff bond-issue opponents.

the bond issue also ask for certain declaratory relief.

The defendants are the Stadium District and certain state agencies and officials. The plaintiffs and intervenors opposing the bond issue do so as citizens, taxpayers, property owners, legislators, and bond holders of Louisiana, and, by appropriate pleading, they do so both individually and as a class action for all persons similarly situated. The Village of Shongaloo also intervenes on behalf of the plaintiffs opposing the stadium bonds.

The trial court rejected 30 of the 32 requests for judicial relief prayed for by the bond-issue opponents. However, it did hold: (a) that the bonds must be sold by the State Bond Commission (under La.R.S. 39:1403) rather than, as proposed, by the Stadium District; and (b) that the provision authorizing imposition of the hotel occupancy tax was unconstitutional, namely Paragraph (M) of Section 47, Article XIV, Louisiana Constitution (as added by Act 556 of 1966 and ratified by the people).

For the reasons to be stated, we hold that the trial court erred in both holdings.

We shall discuss in this opinion all issues before us in the present suit and in the companion cases, which were consolidated for trial and for review by us. By appeal or by the grant of supervisory review, all issues raised in all three proceedings are before us.

Many of the contentions presently made were determined adversely to the bond-issue opponents in previous litigation. Arata v. Louisiana Stadium and Exposition District, 254 La. 579, 225 So.2d 362 (1969).[2] The principal issues not therein discussed concern:

1. Does a 30-day constitutional peremption bar the present attack upon the second series bonds and the means provided to finance it?

2. If not, does 1968 legislation (La.R.S. 39:1401 et seq.) require that the Stadium District bonds be sold by the State Bond Commission instead of by the District?

3. If peremption does not bar such attack, does the hotel occupancy tax offend the equal protection clause of the Fourteenth Amendment to the United States Constitution?

4. Was the approval of the State Bond and Tax Board to issuance of the second series bonds justified and in accordance with law?

2. The lease and the financing arrangements have withstood other attacks in state and federal court. See, e. g., Watermeier v. Louisiana Stadium and Exposition District, 235 So.2d 114 (La. App. 4th Cir. 1970), cert. denied 256

La. 245, 236 So.2d 28 (1970); Watermeier v. Louisiana Stadium and Exposition District, 308 F.Supp. 273 (E.D. La.1969), affirmed 398 U.S. 955, 90 S.Ct. 2172, 26 L.Ed.2d 539 (1970).

5. Are the opponents entitled to certain declaratory relief?

### Context Circumstances

By constitutional amendment in 1966, Section 47 of Article XIV was added to our State Constitution. The amendment created the Louisiana Stadium and Exposition District. The Stadium District is composed of the territory in the Parishes of Orleans and Jefferson and is governed by an appointed Board of Commissioners.

The Stadium District was created "to plan, finance, construct, develop, maintain and operate facilities" within the District in which "the holding of sports events, athletic contests and other events of public interest". Section 47(C). The specific intent was to authorize the financing and construction of a huge multi-purpose domed stadium to enhance the tourist, commercial, convention and sports activities of the State.

To construct and operate the facilities, the Stadium District was authorized to incur debt and issue bonds, to levy and collect a hotel occupancy tax in Jefferson and Orleans Parishes and to pledge the proceeds to the payments of its bonds, to mortgage or lease the District's property, and to pledge any lease or leases and the revenues and benefits therefrom. Under the amendment, the powers granted by it to the Stadium District to accomplish its functions were self-sufficient and plenary.

The Stadium District was authorized to construct the huge multi-purpose facility. It was also authorized, inter alia, to lease the premises to the State. In connection with this last authority, the Stadium District entered into a lease agreement dated as of February 1, 1969 with the State of Louisiana. Under the terms of the lease, the State is to pay any net costs of the operation, maintenance, repairs and bond servicing resulting after deduction of revenues derived from the operation of the facility and from the hotel occupancy tax.

By a resolution of February 21, 1969, the Stadium District authorized the immediate issuance of $16,500,000 First Series Hotel Occupancy Tax and Stadium Lease-Rental Bonds, to be used principally for the costs of preparing plans and acquiring the site for the construction of the project. Section 5, Exhibit D–1. By timely suit, the issuance of this first series bonds and of the financing arrangements therefor were attacked. This court rejected all attacks upon these bonds and the resolution of February 21, 1969 authorizing them. *and providing for their payment through the hotel occupancy tax and the lease-rentals*. Arata v. Louisiana Stadium and Exposition District, 254 La. 579, 225 So.2d 362 (1969). (We shall describe later the resolution of February 21, 1969 in greater detail, since it is pertinent to decision of the issues raised in the present proceedings.)

On May 5, 1970, the District sold this first series of bonds, $16,500,000 in principal amount. The proceeds were and are being used to acquire the site and to prepare the same for construction of the domed stadium, as well as to prepare plans and specifications.

In March, 1971, after receiving bids, the Stadium District awarded its prime construction contract. On March 18, 1971, the District adopted its resolution authorizing the issuance of $113,000,000 Second Series Hotel Occupancy and Lease-Rental Revenue Bonds. Exhibit P–1, Appendix E. This was the amount determined, after hearing, as necessary to complete the construction of the domed stadium, as well as to prepare plans and specifications.

The present related proceedings have been filed to attack the issuance of the second series $113 million bonds and the means used to finance their payment—the same means provided, incidentally, to pay the first series bonds previously approved by this court in *Arata.*

We shall discuss seriatim the principal issues previously noted.

1. *Does a 30-day constitutional peremption bar the present attack upon the second series bonds and the means used to finance it?*

■ At the threshold, the defendants except that the causes of action stated by the bond issue opponents are perempted. They principally rely on Paragraph (L) of the constitutional amendment (Section 47) creating the Stadium District and authorizing it to issue bonds. In essence, Paragraph (L) provides that proceedings may not be brought to contest the validity or legality of stadium bonds, or of the resolution authorizing their issuance and providing for their payment, unless such proceedings are brought within thirty days of the date of the publication of such resolution.[3]

---

3. Article XIV, Section 47, Paragraph (L) provides in full: "No proceedings in respect to the issuance of any such bonds shall be necessary except such as are contemplated by this amendment. For a period of thirty (30) days from the date of publication of the resolution authorizing the issuance of bonds hereunder, any person or persons in interest shall have the right to contest the legality of the resolution and the legality of the bond issue for any cause, after which time no one shall have any cause or right of action to contest the legality of said resolution or of the bonds authorized thereby for *any cause whatsoever. If no suit,* *action or proceedings are begun contesting the validity of the bonds within the thirty (30) days herein prescribed, the authority to issue the bonds and to provide for the payment thereof, the legality thereof and of all of the provisions of the resolution authorizing the issuance of the bonds shall be conclusively presumed,* and no court shall have authority to inquire into such matters. Such bonds shall have all the qualities of negotiable instruments under the law merchant and the Negotiable Instruments Law of the State of Louisiana." (Italics ours.)

The Stadium District contends that this peremptive period commenced after publication of the resolution of February 21, 1969. That resolution authorized the issuance of both a first and also of additional series bonds *and provided for their payment by the pledge and assignment of the hotel occupancy tax and of the rentals to be paid by the State* to the District for the lease of the stadium facilities. Section 4, Exhibit D–1. See also title of Resolution, D–1, describing its contents.

The bond-issue opponents contend, on the other hand, that these proceedings are valid since brought within thirty days of the publication of the Stadium District's resolution of March 18, 1971. This resolution fixed the amount and authorized the issuance of $113 million second series bonds. If the opponents are correct, then the present attacks are timely filed.

At this point, we should describe the resolution of February 21, 1969 more fully. Exhibit D–1. This resolution not only authorized the issuance of $16,500,000 first series bonds to acquire the site upon which the stadium was to be built. It further specifically authorized the issuance of additional series of bonds to complete the cost of site acquisition and to accomplish the construction and equipping of the dome stadium. Section 6.

Issuance of these additional series was authorized, either at one time or from time

to time, and estimated to be $77 million in principal amount. However, the resolution also specifically provided that this additional principal amount should be reduced, or, pertinently, increased in aggregate principal amount if the costs of acquisition and construction were either less, or, pertinently, greater than the estimated amount. D–1, Section 6. Certain safeguards were provided to assure that the amount of the bonds issued did not exceed the reasonable cost of stadium facilities planned as feasible.

The resolution further provided that the bonds were payable and secured solely by the revenues of the Stadium District, including the hotel occupancy tax. The lease and all rights of the Stadium District thereunder were also pledged and assigned to the payment of the bonds in principal and interest. Section 4.

We must note that the *second series* resolution of March 18, 1971, authorizing the issuance of $113 million bonds, by its terms, specifically (a) supplemented the February 21, 1969 resolution (which, to repeat, had authorized the issuance not only of the "first series" but also of "additional series" bonds) and (b) was issued pursuant to and under the authority of this first general resolution. Exhibit P–1, p. E–7.

In overruling the peremptive plea, our trial brother reasoned that the thirty day peremptive bar as based upon the resolu-

tion of February 21, 1969, applied only to attacks upon the validity of the *first series* bonds to be issued under that resolution. The court reasoned: "It is inconceivable to the court that the District in its resolution of February 21, 1969, could by general language authorize the issuance of bonds if and when needed in indeterminate amounts and thus remove all further issuances from challenge." [4]

If such reasoning is valid, the opponents of the stadium may raise anew, after each additional bond issue, the same objection to the lease and financing arrangements, including the hotel occupancy tax, as those which within the peremptive period had been or could have been raised in opposition to the first series bonds. Such an interpretation would permit indefinite re-litigation of the same basic issues each time a similar resolution was adopted authorizing additional bonds. By such interpretation, opponents may question anew the general and specific authority to issue all stadium bonds and to provide for their payment, even though such attacks had been rejected when the first series bonds were validated.

We must reject such an interpretation of Paragraph (L). This constitutional provision (quoted in full in footnote 3 above) flatly provides that, only for a period of thirty days after date of the publication of the resolution authorizing the issuance of stadium bonds, may any person "have the right to contest the legality of the resolution and the legality of the bond issue for any cause." Following this thirty-day peremptive period, "the *authority* to issue the bonds and *to provide for the payment thereof*, the legality thereof and of all of the provisions of the resolution authorizing the issuance of the bonds shall be conclusively presumed." (Italics ours).

With regard to issues raised in the present proceedings, we therefore regard the resolution of February 21, 1969 as having established: (1) the authority of the Stadium District to issue the bonds (rather than any other agency), including both the first series and any additional series authorized by said resolution; and (2) the legality of providing for the payment of these bonds by (a) the hotel occupancy tax of the District applicable to Orleans and Jef-

4. The trial court concluded: "The District itself felt it necessary to adopt a new resolution and then submit it for approval to the State Bond and Tax Board." This overlooks that the original resolution of February 21, 1969, authorized both (a) the $16,500,000 first series bonds and (b) the additional series bonds for construction purposes estimated in the amount of $77 million, more or less. The resolution contemplated that, in ad-

dition to this general authorization, in each instance there should be further resolutions authorizing the issuance of additional bonds and (following approval by the State Bond and Tax Department, as required by Paragraph (F) of the amendment creating the District) fixing the time and place of sale. See Section 6(i) of the resolution of February 21, 1961. Exhibit D-1.

ferson Parishes, and (b) the rentals from the Stadium District's lease of facilities to the State, which was specifically held valid in *Arata* in all its terms, including the State's unconditional obligation to pay the rentals.

We thus regard the resolution of February 21, 1969 as having authorized the issuance of not only the first series but also of additional series bonds for the same basic purposes, secured by the pledge of the same revenues, and in furtherance of a comprehensive general plan to accomplish the purposes of the Stadium District. The present attacks on the authority of the Stadium District to issue the bonds and upon the means provided by such resolution to secure the bonds issued and to be issued (the hotel occupancy tax, the State lease, and the rentals therefrom) we regard as being attempts once again to "contest the legality of the resolution" of February 21, 1969, and of the first and additional series bonds *"authorized thereby"*, as well as upon "the *authority* of the District to issue the bonds and *to provide for the* payment thereof." Included within such perempted grounds are the allegations that the District's lease to the State as of February 1, 1969, is subject to rescission for alleged error of law or fact or is invalid because, allegedly, the approval of the State Bond and Tax Board was not secured to its execution.

The thirty-day constitutional peremption provided by Paragraph (L) bars the raising anew of these grounds of invalidity of the bonds and of the financing; all of these grounds were available and could have been raised within the thirty-day peremptive period following the publication of the resolution of February 21, 1969 to invalidate it or its authorization to issue and to finance the payment of both first and additional series bonds. (Many of these grounds for invalidity were, in fact, rejected in our *Arata* decision.)

In broad terms, Paragraph (L) prohibits post-peremption attack *"for any cause whatsoever"* upon the legality of the resolution or the bonds, as well as for a conclusive presumption of the District's authority to provide for payment thereof. The purpose of such broad peremptive provisions is to prevent subsequent attacks upon both the bonds and the taxes or other means provided for their payment, so that investors may rely upon the integrity of their security and so as to assure the best marketability of public improvement bonds. Ammen v. City of Pineville, 247 La. 89, 170 So.2d 1 (1964); McLavy v. American Legion Housing Authority, 227 La. 300, 79 So.2d 316 (1955); Roberts v. Evangeline Parish School Board, 155 La. 331, 99 So. 280 (1923). It is to be remembered that the hotel occupancy tax and the lease rentals, once again questioned in these proceedings, secure not only the additional series

bonds but also the first series bonds, which latter the opponents concede to be beyond attack by reason of the constitutional per-emption.

■ We may further note that a failure to challenge a state bond measure as violating federal constitutional requirements of equal protection within the state per-emptive period will bar any person in interest from thereafter attacking for such reason the bond issue or the means provided for its payment. Chambers v. Road Dist., 255 La. 55, 229 So.2d 698 (1969), cert. denied, 397 U.S. 963, 90 S.Ct. 998, 25 L.Ed.2d 256 (1970); Andrieux v. East Baton Rouge Parish School Board, 254 La. 819, 227 So.2d 370 (1969).

2. *Does 1968 legislation require that the Stadium District bonds be sold by the State Bond Commission instead of by the District?*

■ The trial court held that the $113 million second series bonds authorized by the 1971 resolution of the District could not be sold by the Stadium District itself. Our trial brother held that instead such bonds must be sold by the State Bond Commission pursuant to 1968 legislation (La.R.S. 39:1401–06) enacted subsequent to the 1966 constitutional amendment creating the Stadium District. This legislation provides that the State Bond Commission should, after November 25, 1968, sell all bonds of the State and its agencies and instrumentalities, with certain specified exceptions (not including the Stadium District).

The opponents admit that the Paragraph (F) of the enabling amendment (Section 47) specifically provides that "Without reference to any other provisions of this Constitution or of any laws enacted thereunder and as a grant of power in addition to any other authority to issue bonds, the District is authorized, with the approval of the State Bond and Tax Board, to issue negotiable bonds."

However, despite this direct and plenary constitutional grant of power to the District itself to issue the bonds, the opponents rely upon the provisions of the Paragraph (T) of the amendment. This reserved power to the legislature "to more fully define the rights and obligations of the District" or to "otherwise legislate in any manner or to any extent" with regard to the District and "its powers, duties and functions".[5]

---

5. Article XIV, Section 47, Paragraph (T) provides in full: "This amendment is to be regarded as self-sufficient and self-executive without any supplementary action on the part of the Legislature or any other State authority. The Legis-lature is nevertheless authorized to more fully define the rights and obligations of the District or otherwise legislate in any manner and to any extent with re-gard to the Louisiana Stadium and Ex-position District, its governing body and

We do not interpret Paragraph (T) as providing that the direct constitutional grant of the "self-sufficient and self-executing" authority to the Stadium District to issue bonds should automatically be modified by subsequent general legislation pertaining to bond issues. In this regard, the intent of Paragraph (T) is only that, providing no obligation of previous contracts is impaired, the legislature is authorized to enact *special* legislation "to more fully define the rights and obligations of the District" or to legislate otherwise *"with regard to the Louisiana Stadium and Exposition District,* its governing body and its powers, duties and functions."

Under this construction of Paragraph (T), the special law (constitutional provision) relating to issuance of bonds by the Stadium District prevails over the subsequent general legislation regulating bond-issuance. A general rule of statutory construction is that, in the absence of legislative intent to the contrary, a special statute enacted for a particular purpose will not be presumed to have been within the scope of a subsequent general enactment on the same subject matter, State ex rel. Day v. Rapides Parish School Board, 158 La. 251, 103 So. 757 (1925); that, in the event of ambiguity or conflict, special laws prevail over general laws. State v. Mejia, 250 La. 518, 197 So.2d 73 (1967); State Through

its powers, duties and functions, provided, however, no such changes or legislation shall impair the obligation of any contract

Department of Highways v. Macaluso, 235 La. 1019, 106 So.2d 455 (1958); see 82 C. J.S. Statutes § 347 b. Here, of course, mere legislation general in nature cannot be deemed to have modified a self-executing constitutional provision specially regulating in its entirety a specific state instrumentality.

The obvious purpose of the 1968 legislation, La.R.S. 39:1401–06, is to cover the whole subject matter of bond issuance, so ordinarily it supersedes prior special legislation on the issue. Johnson v. Sewerage District No. 2, 239 La. 840, 120 So.2d 262 (1960). In the present instance, however, the specific intent of the 1966 constitutional provision was to grant the Stadium District self-sufficient powers, other provisions of law to the contrary notwithstanding; and also, by Paragraph (T), to subject such self-executing and self-sufficient powers to subsequent legislative revision only by *special* legislation specifically intended to exercise this constitutional power of limited modification.

3. *Does the hotel occupancy tax offend the equal protection clause of the Fourteenth Amendment to the United States Constitution?*

■ Paragraph (M) of the enabling amendment (Section 47) authorized the

or contracts theretofore entered into by the District."

District to levy a hotel occupancy tax of 4.5% upon hotel rentals within the District (Orleans and Jefferson Parishes), the rate dropping to 4% after three years. This was to replace the 2% local sales on the occupancy of hotel rooms within the District and the 2% state sales tax, both of which were abated during the existence of the District's hotel occupancy tax. Thus, the hotel occupancy tax to be paid by hotel users to the Stadium District replaced the 4% state and local taxes abated.

In accordance with this constitutional authority, the local governments abated their sales taxes and the Stadium District levied its hotel occupancy tax. The proceeds of this tax were pledged to assure payment of the first series bonds and of additional series bonds issued or to be issued as authorized by the resolution of February 21, 1969.

In the present proceedings, the bond-issue opponents obtained a declaratory judgment that Paragraph (M) is unconstitutional as violating the equal protection clause of the Fourteenth Amendment to the U. S. Constitution. The reasoning is apparently that hotel users outside the District are paying a greater State sales tax than are the hotel users within the District (i. e. Orleans and Jefferson Parishes), and that this constitutes impermissible discrimination.

In essence, equal protection under the Fourteenth Amendment requires that state action affect alike all persons and interests similarly situated. Nevertheless, differences of treatment may validly be accorded to persons or interests classified differently, with a state having great latitude in making classifications. Differences and distinctions in treatment offend the constitutional guarantee only when the variations are arbitrary and without rational basis reasonably related to a valid governmental purpose. Petition of Sewerage & Water Board of New Orleans, 257 La. 716, 243 So.2d 809 (1971), Walters v. City of St. Louis, 347 U.S. 231, 74 S.Ct. 505, 98 L.Ed. 660 (1954).

Also, the states have very wide discretion in the levying of their taxes. The equal protection clause imposes no iron rule of equality, prohibiting the flexibility and variety that are appropriate to reasonable schemes of state taxation. Allied Stores of Ohio, Inc. v. Bowers, 358 U.S. 522, 79 S.Ct. 437, 3 L.Ed.2d 480 (1959).

In the final analysis, the effect of the stadium amendment at issue here is to create two classifications of taxation of hotel room occupancy for the State of Louisiana. One class consists of the parishes of Orleans and Jefferson. The other class consists of the remaining sixty-two parishes of the state.

Every user of hotel rooms in the first class is treated exactly alike. Every user in the second class is treated exactly alike. The fact that there might be some disparity of treatment between the two classes is immaterial, for we find that the classification is rationally related to effectuating what we have previously determined (Arata v. Louisiana Stadium and Exposition District, 1969, 254 La. 579, 225 So.2d 362, 371) to be a valid public purpose. As noted by Paragraph (M), the state and local sales taxes are abated on hotel users within the Stadium District (who instead pay an identical amount of hotel occupancy tax to the District) "in consideration of the economic and financial benefits accruing to the state, the City of New Orleans and the Parish of Jefferson from the construction and operation of the District's facilities."

Neither class of hotel user, District or non-District, pays a greater total burden. In effect, the state taxing power allocates the sales tax on hotel occupancy outside the District to general state purposes, and the sales tax on hotel occupancy within the District to the construction and operation of the stadium facilities, a special state purpose, in view of what the legislature had a·reasonable basis to determine as the economic and financial benefits accruing to the entire·state from such sports and entertainment. center. Equal protection requirements do not prevent the exemption, for a rational purpose, of one class of user

from a general state taxation to which·other classes are subject. Carmichael v. Southern Coal & Coke Co., 301 U.S. 495, 57 S.Ct. 868, 57 S.Ct. 868, 81 L.Ed. 1245 (1937); Hess v. Mullaney, 9 Cir., 213 F.2d 635 (1954), cert. denied, Hess v. Dewey, 348 U.S. 836, 75 S.Ct. 50, 99 L.Ed. 659 (1954).

We thus note that, on the merits, the hotel occupancy tax does not offend .the equal protection guarantee of the federal constitution. Nevertheless, in reversing the·trial court judgment to the contrary, we primarily rest our holding upon our conclusion, previously noted, that Paragraph (L) bars, as perempted, this belated attack upon the district's "authority" by· such tax "to provide for the payment" of: the bonds issued pursuant to the resolution of February 21, 1969.

4. *Was the approval of the State Bond and Tax Board to issuance of the second series bonds justified and in accordance with law?*

■ The demands in the intervention by Mrs. Martha G. Robinson and in the·companion suit, Branton v. State Bond .and· Tax Board, 259 La. 313, 249 So.2d 920 ,decided this date), pray that the action of.the State Bond and Tax Board in approving the issuance of $113 million second,series bonds be set aside for several reasons.. Paragraph (F) authorizes the District to

issue bonds, but requires the approval of the State Bond and Tax Board.[6]

Certain technical defects are alleged, including the alleged failure to give adequate notice and to afford adequate hearing and to make findings of fact and conclusions of law. Perhaps more important, the opponents charge that the decision and hearing of the State Bond and Tax Board was inadequate and improper because its decision was not supported by reliable, probative, and substantial evidence.

The trial court correctly dismissed these contentions as unfounded. At the trial below, participants testified as to the presentation made to the Board of the economic feasibility of the project. The transcript of the Board hearing of April 12, 1971 was also introduced in evidence. Exhibit D–11. At this hearing, the Board had ratified and re-affirmed the action of the Stadium District and approved the issuance and sale of $113 million second series stadium bonds.

The uncontradicted evidence produced at this Board hearing shows that the Stadium District's governing body adopted the plans for construction of the stadium based upon research and recommendation by a recognized national institution specializing in such studies. Based upon the institution's research and report, the District's governing body concluded that the construction of a domed stadium of the size and nature indicated was feasible, that the issuance of bonds in the amount planned was justified, that by 1979 the net operating revenues produced should be enough to exceed the debt service requirements, and that over thirty years the surplus of the net revenues of the debt service requirements and repayment of the initial State lease rentals should afford the State a net profit in the area of $60,000,000 over any amount advanced by it to the district in the form of rentals. See Exhibits D–11 and P–1 (p. 23).

The trial court correctly held that the approval of the State Bond and Tax Board was justified as based on the preponderant (and indeed uncontradicted) evidence and showing that such Board action certainly did not constitute an abuse of any discretion of the Board in the matter. (At the Board hearing, stadium opponents, including present plaintiffs, had appeared and made speeches but they made no attempt to controvert the showing and evidence of feasibility adduced by the Stadium District.) The trial court further correctly

6. The State Bond and Tax Board was created by Act 285 of 1944 (now La. R.S. 47:1801–1808). Its primary purpose is to supervise the incurring of debt by political subdivisions, boards, public corporations, special districts and taxing districts of the State of Louisiana. The supervisory mechanism is the Board's power to consent to and approve bond issues and other forms of public borrowing, in instances in which the subject governmental units are authorized to borrow by the constitution and laws of the state. La.R.S. 47:1803.

held that all procedural requirements had been satisfied.[7]

### 5. Are opponents entitled to certain declaratory relief?

 The petitions in this and in the companion suits, and the petition in the class action filed by Mrs. Martha G. Robinson as an intervention, request declaratory judgment on perhaps thirty issues of budget procedure, of bond-payment priorities, and of payment of the State's lease rentals.[8]

The declaratory relief is sought by virtue of La.CCP Arts. 1871–83. These substantially incorporate the provisions of the Uniform Declaratory Judgments Act.

The consistent interpretation of the Uniform Act and of our own code articles is that declaratory relief is available only to decide justiciable controversies, and that such enactments do not empower the courts to render advisory opinions on abstract questions of law. Petition of Sewerage & Water Board, 248 La. 169, 177 So.2d 276 (1965); Stoddard v. City of New Orleans, 246 La. 417, 165 So.2d 9 (1964); Poe v. Ullman, 367 U.S. 497, 81 S.Ct. 1752, 6 L. Ed.2d 989 (1961).

A "justiciable controversy" connotes, in the present sense, an existing actual and substantial dispute, as distinguished from one that is merely hypothetical or abstract, and a dispute which involves the legal relations of the parties who have real adverse interests, and upon which the judgment of the court may effectively operate through a decree of conclusive character. Further, the plaintiff should have a legally protectable and tangible interest at stake, and the dispute presented should be of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.

See: Maryland Casualty Co. v. Pacific Coal and Oil Co., 312 U.S. 270, 61 S.Ct. 510, 85 L.Ed. 826 (1941); Aetna Life Ins. Co. of Hartford, Conn. v. Haworth, 300 U.S. 227, 57 S.Ct. 461, 81 L.Ed. 617

---

7. We do not reach the contention that the Administrative Procedure Act, La.R.S. 49:951–66, is applicable to determinations by the State Bond and Tax Board. See Dakin, The Revised Model State Administrative Procedure Act, 25 La.L.Rev. 799 (1965). The judicial review by the present proceedings, and the statements of fact and conclusions of law preceding the adoption of the Board's resolution, see D–11, constitute, as the trial court notes, substantial compliance with the requirements of the Act, if applicable (See specifically La.R.S. 49:958 and 963).

8. Certain of the requested declarations assert invalidity of procedures of the Stadium District in leasing the facilities to the State, but of course the thirty day peremptive bar prevents re-urging the invalidity of the lease, through the resolution of February 21, 1969 as a means "to provide for the payment" of the bonds authorized thereby. (Paragraph L) Additionally, our Arata decision specifically rejected such attacks in validating the lease.

(1937); 6 Moore's Federal Practice, Sections 57.11 and 57.12 (1966); Uniform De-claratory Judgments Act, 9 U.L.A., Section 1, Annotations Note 35 (1965).

Based upon these criteria, the trial court correctly denied declaratory relief on the many demands presenting merely abstract questions of law which might hypothetically arise, but as to which there is no present actual dispute ripe for adjudication.

For instance, in *Arata* this court held that the State is unconditionally obligated to pay the rentals to the Stadium District, and that this enforceable obligation constitutes a charge against the State's revenues, both attributes being "components of a transaction involving the full faith and credit of the State." Arata v. Louisiana Stadium and Exposition District, 254 La. 579, 225 So.2d 362, 371 (1969). See also Paragraph (E) of the enabling amendment (Section 47).

Some of the requests for declaratory relief demand rulings on how and if such rentals should be included in the executive budget, or whether stadium-bond·holders may mandamus the State or its legislature to pay such rentals, if and when they accrue, and if the State should attempt to default on what in *Arata* we held to be a full faith and credit obligation. There is no present dispute of sufficient immediacy and reality to justify rendering what would be merely an advisory opinion on a hypothetical or abstract question of law.

Again, the intervention of Mrs. Martha G. Robinson, a class action on behalf of all persons owning full faith and credit bonds of the State, asserts many demands by way of declaratory and injunctive relief. The cause of action is based upon alleged prejudice such bondholders might sustain through diversion of state revenues to the stadium lease rentals, and the prayer includes demands that the courts establish a priority in ranking between the plaintiff's full faith and credit bonds and the full faith and credit obligation of the State to pay the Stadium lease rentals.

The showing made, however, negatives any prejudice to such bondholders and obviates the existence of any dispute between these two categories of creditors owed full faith and credit obligations by the State. The stipulations and evidence show (a) that current state revenues annually available to pay the bonds exceed $500 million dollars, (b) that the principal and interest payable bondholders annually is only $25 million annually, (c) while the gross annual stadium bond payments (principal and interest) can never exceed $10 million.[9]

9. While the gross amount due for bond service will not exceed ten million, against the State's obligation to pay such as rentals is credited the revenues from the hotel occupancy tax and from the net profits of the enterprise. Under

Exhibit D–11, p. 23. Thus, there is no actual or potential dispute between the State's general bondholders and the Stadium District bondholders, since the annual state revenues available to service both categories obligations far exceeds the annual total due for both of them.

### Conclusion

To reiterate what we stated in *Arata*, 225 So.2d 373:

The opponents of the stadium bond issues have throughout this litigation attacked the actions authorized by the stadium amendment as unwise and founded upon poor financial judgment. However, it is not for the courts to question the wisdom of the legislature and the people in adopting the amendment and authorizing the actions here attacked, for we are bound to interpret and apply the law as written. Nor can we substitute our own views for the considered determinations of other agencies of government in matters entrusted to their administration by the state con-

stitution; nor, on the basis of suppositions, reject substantial and uncontroverted showings made at hearings before such agencies, on the basis of which they have acted.

### Decree

For the reasons heretofore assigned, we affirm the judgment of the trial court insofar as it dismissed various demands of the plaintiffs and intervenors for declaratory and injunctive relief; but we reverse such judgment insofar as it held that the second series bonds must be sold by the State Bond Commission and insofar as it declared unconstitutional Paragraph (M) of Section 47 of Article XIV, Louisiana, Constitution. Accordingly, judgment is rendered dismissing the plaintiffs' suit and, all interventions and incidental actions. The plaintiffs and intervenors are cast with all costs of these proceedings, except as exempted by law.

Affirmed in part; reversed in part; and the plaintiffs' suit and all interventions and incidental actions are dismissed.

---

the projection of expenses and revenue, the State will incur a deficit for the rentals for only four early years of the stadium's operations, the greatest annual deficit being slightly in excess of $2½ million. Exhibit D–11, p. 23.