TATE, Justice.
 

 The Sewerage and Water Board of New Orleans appeals a District Court judgment declaring invalid certain provisions of the state constitution. As authorized by these provisions, the Board proposed a drainage project. By these proceedings, the owners of the lands affected oppose such project.
 

 The essential issues of this appeal concern : I. Do the state constitutional provisions, as applied, offend Eqttal Protection guai-antees of the federal constitution ? ; and, II. Are the state provisions impermissibly vague in describing the lands affected (or, alternatively, do they exclude the properties of the landowners-appellees) ?
 

 
 *721
 

 Facts
 

 We are here concerned with the validity and application of the “Drainage Act Amendment” to the state constitution, Article XIV, Sections 23.13 through 23.27, as added by Act 542 of 1958, ratified by the People.
 

 The provisions of the Amendment divide the City of New Orleans between the "largely undrained sections” (Area A) and “the remaining area” (Area B). The Board is authorized to divide Area A into a number of “defined drainage areas”, based on logical engineering principles.
 

 The sections of the Amendment further provide:
 

 Whenever the Board is prepared to drain any such defined drainage area, it is directed to fix the estimated cost of drainage of that drainage area and then to assess to each tract included its proportionate share of the cost of the improvements. Section 23.13. The landowners may object to the drainage plan at a Board hearing called for that purpose. Section 23.14.
 

 If the Board desires to proceed after hearing the objections, it must file in district court a petition for confirmation of the plan, together with any modifications that result from the hearing. The landowners affected may contest the plan in the resultant judicial proceedings. Section 23.15.
 

 The present proceedings are brought under this last provision. The Board petitions to have judicially confirmed its drainage plan for Drainage Area A-5. The plan was proposed after compliance with, the precedent procedures set forth in the Drainage Act Amendment.
 

 After a limited hearing, the District Court dismissed the Board’s petition for confirmation of the drainage plan. The judgment did so on the ground of the unconstitutionality of the entire Drainage Act Amendment (upon which the plan was based), as denying the appellee landowners Equal Protection rights under the federal constitution. The reasons for judgment also held that the Amendment’s description of the entire Area A (the “largely undrained sections” of New Orleans) was vague and should be construed so as to exclude most of Drainage Area A-5.
 
 [1]
 

 These two holdings (I. The denial of equal protection and II. The description of the lands affected by the Amendment), we regard as raising the essential issues before us on this appeal.
 
 [2]
 

 
 *723
 
 i.
 

 The trial court held that the provisions of the Drainage Act Amendment, as applied, denied the contesting landowners the equal protection of the laws guaranteed them by the Fourteenth Amendment of the United States Constitution. The court’s holding was basically grounded on the circumstance that this 1958 amendment, as first sought to be applied through this A-5 drainage plan proposed in 1969 (11 years later), will cause the contesting landowners’ property to pay for the cost of their land’s drainage, through improvement assessments — whereas land similarly situated in other portions of Area A had from 1958 to 1969 been drained through the use of general tax revenues.
 

 The ascribed unequal treatment occurred in the following context:
 

 The Board or its predecessors had drained the settled area of New Orleans through a millage tax upon all the property located within the city, whether such property received drainage benefits or not. In 1958, the Drainage Act Amendment for the first time authorized drainage improvements to be made through assessments for the cost thereof upon the land drained.
 

 However, the 1958 amendment authorized the liening only of land in Area A (the “largely undrained sections” of the city), not in Area B (the other sections, which the evidence, see discussion in II below, reveals to have been the developed area drained largely pre-1958). The Board was still authorized to levy its 5-mill property tax and continued to do so on lands both in Area A and in Area B.
 

 Furthermore, after 1958 and until the present 1969 drainage lien plan, drainge improvements continued to be financed without liening the land improved. These lands drained after 1958 through use of the millage tax included a section of Area A principally adjacent to the Area B (largely drained) area.
 

 The chief basis alleged as the impermissibly unequal treatment is to this effect : The lands in that portion of Area
 
 *725
 
 A subject to the present drainage program must bear the cost of their own improvement. Yet the millage taxes paid by the land’s owners have contributed to the draining of tracts in Area A drained since 1958, as well as to the drainage over the decades of Area B. Thus, drainage of other land in Area A (and in Area B, for that matter) has been financed by general taxes, yet the properties subject to the present plan must pay for their own drainage through special assessment for the cost thereof.
 

 In essence, equal protection under the Fourteenth Amendment requires that state action affect alike all persons and interests similarly situated. Nevertheless, differences of-treatment may validly be accorded to persons or interests classified differently, with a state having great latitude in making classifications. Differences and distinctions in treatment offend the constitutional guarantee only when the variations are arbitrary and without rational basis reasonably related to a valid governmental purpose.
 

 See: Levy v. Louisiana, 391 U.S. 68, 88 S.Ct. 1509, 20 L.Ed.2d 436 (1968); Morey v. Doud, 354 U.S. 457, 77 S.Ct. 1344, 1 L.Ed.2d 1485 (1957); United States v. Burnison, 339 U.S. 87, 70 S.Ct. 503, 94 L. Ed. 675 (1950); Goesaert v. Cleary, 335 U.S. 464, 69 S.Ct. 198, 93 L.Ed. 163 (1948); Snowden v. Hughes, 321 U.S. 1 (1944). See also: City of Lake Charles v. Wallace, 247 La. 285, 170 So.2d 654 (1965).
 

 Thus, the state has large discretion in classifying areas for special improvement districts. Well within it,.in the present instance, is the legislative determination by the Drainage Act Amendment that the largely undrained sections of New Orleans (i. e., Area A) should bear the cost of their own drainage, unlike the previously drained sections (Area B). (The evidence factually supports this distinction in the sections. See discussion in II below.) Nor does such previous drainage from general tax revenues constitute invidious discrimination against Area A lands, having been accomplished within valid legislative discretion as to the best'mode then to accomplish this valid governmental purpose.
 

 See: Hagmann v. City of New Orleans, 190 La. 796, 182 So. 753 (1938), containing full discussion of prior U. S. Supreme Court and state judicial interpretations. See also City of Alexandria v. Chicago, R. I. & P. R. Co., 240 La. 1025, 126 So.2d 351 (1961). Cf. also Williamson v. Lee Optical of Oklahoma, 348 U.S. 483, 75 S.Ct. 461, 99 L.Ed. 563 (1955).
 

 Before tts now, however, the claim of unequal treatment most seriously urged is the use of general tax revenues since 1958 to drain a portion of Area A, as compared with the Board’s determination in 1969 to assess the present Area A lands with the cost of their own drainage. The appellees point out that all the land of Area A is similarly classified as largely undrained,
 
 *727
 
 and they contend that it is the mandatory duty of the Board to assess all of the lands in Area A with the cost of draining them, not appellees’ lands alone.
 

 The opposing landowners rely upon the principle that, even though a law be on its face constitutional, its unequal administration may constitute an impermissible discrimination. Snowden v. Hughes, 321 U.S. 1, 64 S.Ct. 397, 88 L.Ed. 497 (1944); Yick Wo v. Hopkins, 118 U.S. 356, 6 S.Ct. 1064, 30 L.Ed. 220 (1886); City of New Orleans v. Levy, 233 La. 844, 98 So.2d 210 (1957); Simmons v. City of Shreveport, 221 La. 902, 60 So.2d 867 (1952).
 

 The principle does not apply here. The showing made is only that the Board did not from 1958 through 1969 avail itself of its constitutional power (or, as the appellee landowners might argue, it did not perform its constitutional duty) to make drainage improvements in Area A by assessing their cost to the land benefitted.
 

 That the Board now proposes to do so, does not constitute invidious discrimination : There is no showing, for instance, of intent to assess these lands alone with drainage costs; while contemporaneously draining similarly classified lands through general tax revenues, without any reasonable basis for the distinction in..treatment.
 

 In the Levy case relied upon by appellee landowners, this court itself held, upon rehearing, that a present enforcement of a valid regulation is not unconstitutional discrimination simply because of past unequal enforcement, in the absence of a positive showing of deliberate discriminatory design, intentionally favoring one individual or class over another. 98 So.2d 218.
 

 The past failure to enforce the drainage assessment provisions does not make unconstitutional the present enforcement of them in accordance with law. There may well be other remedies available to those aggrieved. Nevertheless, past or even present lax or erroneous administration of a state regulation does not render its present correct application a denial of the federal constitution’s guarantee of equal protection; at least in the absence of a showing of systematic intent to establish an arbitrary and continuous policy of unjust discrimination.
 

 See: Beck v. Washington, 369 U.S. 541, 554-555, 82 S.Ct. 955, 8 L.Ed.2d 98 (1962); Snowden v. Hughes, 321 U.S. 1, 9, 64 S.Ct. 397, 88 L.Ed. 497 (1944); Southern Ry. Co. v. Watts, 260 U.S. 519, 43 S.Ct. 192, 67 L.Ed. 375 (1923); Mackay Telegraph & Cable Co. v. Little Rock, 250 U.S. 94, 39 S.Ct. 428, 63 L.Ed. 863 (1919); Sunday Lake Iron Co. v. Wakefield, 247 U.S. 350, 38 S.Ct. 495, 62 L.Ed. 1154 (1918).
 

 We therefore conclude that the trial court erred in finding the Drainage Act Amendment unconstitutional in its application to the lands of the appellees.
 

 
 *729
 
 II.
 

 The trial court further held that part of Drainage Area A-5 presently sought to be drained by the Board, was not within the lands of Area A described by the Drainage Act Amendment.
 

 Relevantly (excluding the “West Bank” or Algiers area of the City), the Amendment described as Area A: “the largely undrained areas of the City comprised of the areas lying
 
 east
 
 of the Inner Harbor Navigational Canal and
 
 north
 
 of Florida Avenue * * *.” Section 23.13. (Italics ours.)
 

 The evidence shows that the area of New Orleans on the “East Bank” of the Mississippi River was as of 1958 developed and largely drained
 
 west
 
 of the Inner Harbor Canal (the “Industrial Canal”), which runs between Lake Ponchartrain and the Mississippi River. Also,
 
 east
 
 of the Canal, a small section of the City by 1958 had been developed and drained; this lay
 
 south
 
 of Florida Avenue (i. e., between the Canal on the west, the St. Bernard Parish line on the east, and the Mississippi River on the south). See uncontradicted testimony of ■Hughes at Tr. 229-30 et seq.
 

 The rest of the East Bank territory, all both east of the Canal and- also north or northerly of Florida Avenue, extended eastward and northward over to the Rigolets (a channel between Orleans and St. Tammany Parishes) and Lake Borgne. This portion of the City is further bounded by lakes on the north and the Mississippi River and the St. Bernard Parish line on the south.
 

 The evidence further indicates that, as of 1958, this area of New Orleans
 
 east
 
 of the Canal (except for that small portion south of Florida Avenue) was largely undeveloped and largely undrained. See uncontradicted testimony of Hughes at Tr. 229-30 et seq.
 

 Included within this section of New Orleans east of the Canal is Drainage Area A-5, owned by the appellees. They, however, contend that most of Area A-5 is not within Area A, because — even though in a section of New Orleans northerly of Florida Avenue (i. e., north of a parallel extended from the avenue eastward from the St. Bernard Parish line) — ,the A-5 land is not
 
 due
 
 north of Florida Avenue.
 

 That is, the appellees contend that the Amendment’s description of Area A as the sections of New Orleans “north of Florida Avenue” includes only land due north of this Avenue, i. e., from the Canal on the west to the point on the east where the Avenue intersects the St. Bernard Parish line. This would exclude the large undrained areas of the City east of the Canal and northerly of Florida Avenue above the St. Bernard Parish line.
 

 In so contending, the appellees rely chiefly upon the general rule that, in constriiing
 
 *731
 
 the description in
 
 deeds,
 
 “north” generally means “due north”. Plaquemines Oil & Development Co. v. State, 208 La. 425, 23 So. 2d 171 (1945). Even so, as Plaquemines Oil itself held, this general rule of meaning does not hold in a case where the clear intention is otherwise, as shown either by the instrument itself or by the surrounding circumstances; so that the term can also describe lands northeast or northwest of (i. e., northerly in general relation to) the bound or point described. 23 So.2d 176.
 

 In the present instance, the description in the Amendment itself, reasonably construed in conjunction with the territorial limits of New Orleans
 
 [3]
 
 , shows that the term
 
 "north
 
 of Florida Avenue” was intended to be used in the latter sense:
 

 The Amendment’s description divided the East Bank of New Orleans into largely undrained and largely drained areas.
 

 The obvious intent of the description, in our opinion, was to divide the New Orleans East Bank into
 
 two
 
 areas: (1) all lands west of the Canal and south of Florida Avenue (the largely drained Area B); and (2)
 
 all
 
 lands east of the Canal and north of Florida Avenue (the largely undrained Area A). The latter would include not only land due north of Florida Avenue (i. e., from the Canal until the avenue terminates at the parish line), but all land north of a parallel extending through Florida Avenue (pertinently, including all of Drainage Area A-5).
 

 To construe the description as the appellees wish, we must find that it divides the East Bank into
 
 three
 
 areas: (1) all lands west of the Canal and south of Florida Avenue (forming only
 
 part
 
 of Area B, drained); (2) all lands east of the Canal and
 
 due
 
 north of Florida Avenue (Area A, undrained) ; and (3) the remaining lands
 
 east
 
 of the Canal and also east of Florida Avenue at the point it terminates at the parish line.
 

 According to the appellees’ contention, Area (3) would then form part of drained Area B. In fact, however, Area (3) is indistinguishable from Area (2), in that as of 1958 both were largely undeveloped and undrained; both also are dissimilar from the developed areas of the City represented by Area (1). No rational reason is shown for some artificial line arbitrarily to divide Areas (2) and (3) into separate classifications, thus classifying Area (3) alike with the Area (1).
 

 In short, according to context, the descriptive word “north” may indicate not only due north but also areas north of ?
 
 *733
 
 parallel passing through the hound described, such as lands northeast or northwest of the bound. Plaquemines Oil & Development Co. v. State, 208 La. 425, 23 So.2d 171 (1945); 28A Words & Phrases, verbo “North”, p. 408 (1955); Webster’s International Dictionary, verbo “north”, p. 1541 (3d ed., 1961).
 

 We believe that the context of its use in the Amendment shows that Area A includes all lands north of the parallel extending through Florida Avenue. Except for the area south of Florida Avenue, Area A thus includes all areas of New Orleans east of the Canal. All of Drainage Area A-5 is within this area and is properly therefore subject to the drainage plan proposed.
 

 Having concluded that the Amendment’s description clearly sets forth the limits of Area A, we find no need to discuss the possible pertinence of authorities relied upon by the appellees to the effect that taxing or assessing legislation should be strictly construed.
 

 Decree
 

 For the foregoing reasons, we reverse the judgment of the District Court dismissing the Board’s petition, and we remand this litigation for further proceedings consistent with the views here expressed. The defendants-appellees are cast with all costs of this appeal; other costs to await taxing until final disposition.
 

 Reversed and remanded.
 

 [1]
 

 . Certain issues were not reached (such as whether particular tracts were assessed in excess of the benefits to be derived) or were not decided (such as whether cemetery property could be assessed for the improvements). Those are to bo decided upon the remand.
 

 [2]
 

 . We could find no stipulation or pre-. trial order limiting the hearing held.
 
 *723
 
 However, the briefs and arguments of the parties, and our trial brother’s comments during the hearing, indicate that the hearing was limited essentially to the constitutionality of the Drainage Act Amendment, to the validity or extent of the description of the lands of Area A described therein, and to whether the Amendment’s procedural prerequisites were complied with by the present drainage plan proposed for Area A-5. This limited hearing rejected various other objections to the plan, such as that it offended due process guarantees of the state and federal constitutions (i. e., as well as equal protection guarantees), or that the procedures of the Board in proposing the plan were not in substantial compliance with the requirements of law. We will not discuss such other holdings in the reasons for judgment. They are either clearly supported by legal authority cited by the trial court, or else not complained of by this appeal (to which no answer has been filed, La. OOP Art. 2133).
 

 [3]
 

 . Courts may take judicial notice of the location and the boundaries of the political divisions of the state within which the court is sitting. McCormick on Evidence, Section 328 at p. 703 (1954); 31 C.J.S. Evidence § 33 (2) b. We thus need no extrinsic evidence to reach this construction. In the present case, however, extrinsic evidence was introduced showing these boundaries.