756 So.2d 430 (1999)
J. MANOCO, INC.
v.
STATE of Louisiana, Through LOUISIANA GAMING CONTROL BOARD.
No. 98 CA 1412.
Court of Appeal of Louisiana, First Circuit.
December 28, 1999.
*432 Jill L. Craft, Baton Rouge, Counsel for Plaintiff/Appellant, J. Manoco, Inc.
Richard F. Zimmerman, Jr., P. Raymond Lamonica, Baton Rouge, Counsel for Defendant/Appellee, State of Louisiana, Louisiana Gaming Control Board.
Before: CARTER, C.J., LeBLANC and PETTIGREW, JJ.
LeBLANC, J.
This is an appeal from the revocation of a video gaming license. Upon the recommendation of the Louisiana State Police, Video Gaming Division (the Division), the Louisiana Gaming Control Board (the Board) revoked the video poker license of J. Manoco, Inc., d/b/a Mr. Lucky's Truck Stop (Mr. Lucky's). Eventually, Mr. Lucky's petitioned for judicial review by the district court. The revocation by the Board was affirmed by the district court; Mr. Lucky's appeals.

FACTS
A Type 5 (truck stop) video gaming license was issued to Mr. Lucky's, located on U.S. Highway 190 in Baton Rouge, Louisiana, in 1992. In 1993, after bankruptcy proceedings by the owner of the gaming devices located at Mr. Lucky's, Louisiana Route Operators (LRO), a trustee was appointed by the bankruptcy court to oversee the operations of Mr. Lucky's.
On March 1, 1997, fuel sales at Mr. Lucky's ceased and subsequently, the fuel pumping equipment was removed. By letter dated April 5, 1997, the Board notified Mr. Lucky's of the Division's recommendation to revoke Mr. Lucky's gaming license. The Board stated this revocation was based on information supplied by the bankruptcy trustee that fuel sales at Mr. Lucky's had been closed. The Board alleged that when fuel sales ceased Mr. Lucky's was no longer a "qualified truck stop facility" under La. R.S. 27:306 A(4)(c), and the video gaming devices at the truck stop became illegal gambling devices. Mr. Lucky's video gaming license was suspended pending revocation, and the video gaming devices located at Mr. Lucky's were immediately disabled. The letter also notified Mr. Lucky's of an administrative hearing regarding this matter to be held on April 11, 1997.
A hearing was held before A. Clayton James, Hearing Officer, after which findings of fact and conclusions of law were issued and a recommendation was made to revoke Mr. Lucky's video gaming license. By written decision dated June 19, 1997, adopting the hearing officer's findings and conclusions, Hillary J. Crain, Chairman of the Board, ordered Mr. Lucky's video gaming license revoked. This decision was appealed to the district court in conjunction with a motion by Mr. Lucky's to recuse the office of the Attorney General.
The district court denied Mr. Lucky's motion to recuse the Attorney General and remanded the matter back to the Board for a second hearing. On November 3, 1997, after a second hearing was held, Hearing Officer James issued a statement of the case, findings of facts and legal analysis together with a decision, ordering Mr. Lucky's video gaming license revoked. Mr. Lucky's petitioned for appeal to the Board seeking review of the hearing officer's decision. On January 20, 1998, the Board met and by written decision dated January 21, 1998, the Board affirmed the decision of the hearing officer revoking Mr. Lucky's video gaming license. Mr. Lucky's appealed to the district court. The district court affirmed the decision of the Board. Mr. Lucky's appeals, asserting the district court erred:
(1) in upholding the initial suspension of the Mr. Lucky's license as Mr. Lucky's never operated "illegal gaming devices" because it has a license;
(2) in upholding the suspension of the Mr. Lucky's license because [the] law *433 does not require [the] "immediate notification" of [a] temporary/emergency situation which may arise during the operation of a truck stop;
(3) in refusing Mr. Lucky's requested recusal of the office of Attorney General and refusing to consider Mr. Lucky's constitutional arguments relating to the commingling of functions within the office of Attorney General as they related to the Mr. Lucky's actions by the Board and its Chairman;
(4) in failing to reverse or modify the decision of the board where the office of Attorney General improperly participated in every facet of the Mr. Lucky's action, including drafting the initial suspension, advising the Board and its Chairman, investigation the action, [and] serving as prosecutor;
(5) in refusing to consider the delegation of all authority to Chairman Crain under Board Rule 104 as improper, in violation of the law, and unconstitutional and by later considering Mr. Lucky's arguments as "moot";
(6) in failing to consider that Rule 104 was improperly promulgated and in refusing to address the hearing officer's refusal to allow Mr. Lucky's to put on evidence of the promulgation, the constitution of the board, and the hearing officer's refusal to allow Mr. Lucky's to proffer evidence;
(7) in refusing to consider the Board's violations of the Open Meetings Act;
(8) in refusing to overturn the decision of the Board, by the Board [sic] which remains improperly constituted;
(9) in affirming the decision of the Board where the Board never considered the entire record of the Mr. Lucky's matter before taking action;
(10) in refusing to overturn and/or modify the decision of the Board where Mr. Lucky's proved that other similarly situated truck stops were not penalized as harshly as Mr. Lucky's;
(11) in not requiring the Board to supplement the record with the report of P. Raymond Lamonica relating to his investigation into commingling of function[s] of the Attorneys [sic] General, and in failing to afford plaintiff the opportunity to address its constitutional concerns.
The issues raised by Mr. Lucky's include constitutional issues and the correctness of both factual findings and rulings of law.

MOOTNESS
In the instant matter, Mr. Lucky's prays we reverse the Board's decision revoking its video gaming license.[1] Stated another way, Mr. Lucky's seeks to have its video gaming license reinstated. However, by statewide referendum held on November 5, 1996, East Baton Rouge Parish was one of 33 parishes that rejected video poker. Effective July 1, 1999, video poker is no longer legal in East Baton Rouge Parish. *434 Mr. Lucky's is located in East Baton Rouge Parish. Therefore, as a threshold issue, we must determine whether this matter presents a justiciable controversy.
The jurisprudence is well settled that courts will not decide abstract, hypothetical or moot controversies, or render advisory opinions with respect to such controversies. Cat's Meow, Inc. v. City of New Orleans Through Department of Finance, 98-0601, p. 8 (La.10/20/98), 720 So.2d 1186, 1193. A moot question connotes an issue that has been deprived of practical significance and made abstract or purely academic. A moot case is one in which a judgment can serve no useful purpose and give no practical relief. Louisiana Associated General Contractors, Inc. v. State, Through Division Of Administration, Office of State Purchasing, 95-2105, p. 10 (La.3/8/96), 669 So.2d 1185, 1193.
There are jurisprudentially recognized exceptions to the mootness doctrine. One such exception is the collateral consequence exception. Cat's Meow, 98-0601 at 12, 720 So.2d at 1196; see Nowak & Rotunda, Constitutional Law § 2.12 (5th ed.1995). Although the primary subject of a dispute has become moot, the controversy is not moot if there are collateral consequences to one of the parties. Cat's Meow, 98-0601 at 13, 720 So.2d at 1196.
La. R.S. 27:308 D provides, "[f]or a period of five years from the date of the revocation of the license, no license authorized by this Chapter may be granted to any person whose previous license was revoked by the division." For a period of five years from the date of revocation, Mr. Lucky's is prohibited from obtaining any gaming license. Thus, the collateral consequence doctrine excepts this appeal from being moot. While we cannot reinstate Mr. Lucky's license, the possibility of the imposition of the five-year prohibition of La. R.S. 27:308 D ensures that this appeal is not moot.

STANDARD OF REVIEW
Disputed gaming matters are to be heard by a hearing officer at a public hearing conducted in accordance with the adjudication provisions of the Administrative Procedure Act (APA). La. R.S. 27:25 B(1). Either party to such a hearing may appeal the decision of the hearing officer to the Board. La. R.S. 27:25 E. All appeals from any decision of the Board shall be to the Nineteenth Judicial District Court and shall be reviewed solely on the record. La. R.S. 27:26.
The APA specifies that judicial review shall be confined to the record, as developed in the administrative proceedings. La. R.S. 49:964 F. The district court may reverse or modify the agency decision if substantial rights of the appellant are prejudiced because the administrative findings, inferences, conclusions, or decisions are: (1) in violation of constitutional or statutory provisions; (2) in excess of the agency's statutory authority; (3) made upon unlawful procedure; (4) affected by other error of law; (5) arbitrary, capricious, or characterized by an abuse of discretion or clearly unwarranted exercise of discretion; or (6) not supported and sustainable by a preponderance of evidence as determined by the reviewing court. La. R.S. 49:964 G. On legal issues, the reviewing court gives no special weight to the findings of the administrative tribunal, but conducts a de novo review of questions of law and renders judgment on the record. State, Louisiana Riverboat Gaming Commission v. Louisiana State Police Riverboat Gaming Enforcement Division, 95-2355, p. 5 (La.App. 1 Cir. 8/21/96), 694 So.2d 316, 319.

THE SUSPENSION

Assignment of Error Numbers 1, 2 and 7[2]
Mr. Lucky's raises several issues concerning the correctness of the initial suspension *435 of its license. Included is the issue of whether the gaming devices located at Mr. Lucky's were "illegal gaming devices" and whether Mr. Lucky's was required to immediately notify the Board when fuel sales ceased.
The factual finding that the gaming devices located at Mr. Lucky's were illegal gaming devices, inasmuch as Mr. Lucky's was no longer a qualified truck stop as defined in La. R.S. 27:306 A, is subject to the manifest error/clearly wrong standard. See Carver, Inc. v. State, Department of Public Safety and Corrections, Office of State Police, Video Gaming Division, 95-1664, p. 5 (La.App. 1 Cir. 4/4/96), 672 So.2d 1141, 1144, writ denied, 96-1528 (La.9/27/96), 679 So.2d 1349. The record contains ample evidence to support the finding that fuel sales had ceased and the fuel dispensing equipment at Mr. Lucky's had been removed. La. R.S. 27:306 A(4)(c) requires a qualified truck stop to have fuel facilities and to sell fuel. Without fuel sales or fuel facilities, Mr. Lucky's could not be a qualified truck stop and the gaming devices were not authorized. We cannot say this finding is erroneous.
The provisions of La. R.S. 27:306 set out the requirements for a qualified truck stop facility. Most notable is the cardinal duty to sell a requisite amount of fuel. In addition, regulations subject the licensee to immediate revocation if fuel sales fall below 25,000 gallons of fuel in any single month. See LAC 42:XI:2411(E)(6). Moreover, each licensee is bound by a continuing duty to inform the Division of any action that he believes would constitute a violation of the gaming laws. See La. R.S. 27:310 C. With no fuel sales and no fuel dispensing equipment, Mr. Lucky's was required to notify the Division that fuel sales had ceased. Revocation was authorized and proper in this instance. This argument is without merit.
Mr. Lucky's brief also contains the argument that actions on June 19, 1997, by the Board's chairman, Judge Hillary J. Crain, violated the provisions of the Open Meeting Law.
Pursuant to La. R.S. 42:5, every meeting of any public body shall be open to the public unless statutorily exempt. Moreover, La. R.S. 27:11 G requires all meetings of the Board to be open. However, the suspension of June 19 was not made during a Board meeting subject to the Open Meeting Law. The suspension by Chairman Crain made on June 19 was an immediate and emergency suspension, made upon the recommendation of the Division statutorily charged with investigative and enforcement duties for the Gaming Control Board. See La. R.S. 27:20. The suspension was not the result of a regularly conducted public meeting subject to the Open Meeting Law but rather, was the result of a emergency action taken in response to a perceived threat to the public health, safety, and welfare. Moreover, this action, as recommended by the Division, was only of a temporary nature, reviewed at an administrative hearing before a Gaming Control Board Hearing Officer within six days of the suspension, and was grounded in the public policy requiring strict regulation of all gaming activities. See La. R.S. 27:2 A. The temporary and emergency suspension on June 19 by Chairman Crain in response to the Division's recommendation was not subject to the Open Meetings Law. This assignment is without merit.

RULE 104

Assignment of Error Numbers 5 and 6
Mr. Lucky's alleges the delegation of power to the Board's chairman pursuant *436 to Rule 104 is improper and that Rule 104 was not properly promulgated.[3]
A review of the record in the instant matter reveals that upon the recommendation of the Division, Mr. Lucky's license was suspended. This suspension was based on the reported cessation of all fuel sales by Mr. Lucky's. After an administrative hearing before a hearing officer and based on his written findings of fact and conclusions of law, Chairman Crain, pursuant to his authority as authorized by Rule 104, revoked Mr. Lucky's license. An appeal by Mr. Lucky's to the Nineteenth Judicial District Court, in which both the recusal of the Attorney General and the Rule 104 issue were raised, resulted in a remand "back to the Board for a hearing and decision". The district court retained the Rule 104 issue but stated, "[d]epending on what happens in this case in the future, [the Rule 104 issue] may or may not then be before the court". After an administrative hearing, the hearing officer issued a written decision revoking Mr. Lucky's license. The matter was appealed to the Board.[4]
The Gaming Control Board, meeting on January 20, 1998, considered the appeal by Mr. Lucky's and issued its decision, affirming the hearing officer's decision to revoke Mr. Lucky's license. A second appeal to the district court followed. After consideration of the record, the district court also affirmed the revocation. The district court noted its review was of the decision rendered by a Gaming Control Board Hearing Officer, pursuant to his authority established in La. R.S. 27:25, and affirmed by the entire Board, thereby overcoming any objection by Mr. Lucky's based on Rule 104. We, too, note our review of Mr. Lucky's revocation is review of the revocation by a Gaming Control Board Hearing Officer and affirmed by the entire Board. Any objection to the Chairman's exercise of powers granted to him pursuant to Rule 104 was cured by the administrative hearing before and decision by a statutorily authorized Gaming Control Board Hearing Officer and subsequent appeal to and decision by the full Board. These assignments are without merit.

THE ATTORNEY GENERAL

Assignment of Error Numbers 3 and 4
Mr. Lucky's asserts the multiple roles and commingling of functions within the office of the Attorney General constituted violations of due process that have not been properly considered. It argues that various assistant Attorneys General (assistant AGs) assigned to the Division, the Board and/or working within the Attorney General's Office, had ex parte communications and improperly influenced one another, resulting in the commingling of investigative and adjudicatory functions within the Attorney General's Office. In *437 support, Mr. Lucky's cites Allen v. Louisiana State Board of Dentistry, 543 So.2d 908 (La.1989) and Georgia Gulf Corporation v. Board of Ethics for Public Employees, 96-1907 (La.5/9/97), 694 So.2d 173.
In Allen, 543 So.2d at 914, the Supreme Court held an accused's right to due process before an administrative board was violated when the prosecutor drafted the findings of fact and conclusions for the administrative board. In Georgia Gulf, 96-1907 at 7-13, 694 So.2d at 177-79, the Supreme Court again held a former employee's due process rights were violated when the same individual served to both prosecute alleged violators before the Ethics Commission and supply the finding of facts utilized to support the Commission's opinion. Georgia Gulf advanced three criterion from Allen by which to evaluate administrative adjudicatory procedures challenged on due process grounds. The issues of (1) the failure to follow the procedural rules, especially those rules relating to the preparation of the administrative board's findings of fact, (2) the damage done to the appearance of fairness by the prosecutor's involvement in drafting the board's opinion, and (3) the adverse consequences that the commingling of the prosecutorial and adjudicative functions has on the right to meaningful judicial review provide a framework for examining the actions of prosecutors and adjudicators of administrative decisions when due process issues are raised. Georgia Gulf, 96-1907 at 7-13, 694 So.2d at 177-79.
In the instant matter, Mr. Lucky's has argued acts by individual assistant AGs offend the latter two of these principles. In particular, Mr. Lucky's alleges the district court erred in failing to recuse the office of the Attorney General, based on the commingling of functions within the office, and in failing to overturn the Board's decision when assistant AGs participated in investigating and prosecuting this matter. Mr. Lucky's begins its challenge of the office of the Attorney General with reference to La. R.S. 27:19, which provides:
A. The attorney general or his designee shall be the legal advisor and legal representative to the [Louisiana Gaming Control] board, chairman, and office of state police relative to all gaming matters under the board's jurisdiction, and in all legal proceedings.
B. The attorney general shall provide criminal investigative services to the board.
C. The board shall reimburse the attorney general for legal, investigative, and administrative costs incurred in advising and representing the board, chairman, and state police.
This legislative scheme places in the office of the Attorney General the duty of legal representative of the Board, the Chairman, and the state police, which is charged with the investigation and enforcement of the laws, rules, and regulations relative to gaming activities. However, because Mr. Lucky's has provided no evidence to the Hearing Officer, Board, district court, or to us of specific conduct by any assistant AG involved in this matter which, in fact, constituted improper commingling of functions[5] we test this matter against the familiar prohibition against the "appearance of impropriety" discussed in Georgia Gulf, 96-1907 at 9-10, 694 So.2d at 177-78.
We find no perceived impropriety with a system whereby individual attorneys, albeit each employed by the office of the *438 Attorney General, each represent a different agency, department, division, or board of the State of Louisiana. The challenged attorneys in this matter all worked for and represented distinct entities. The various assistant AGs worked at different locations and were directed by different supervisors. There was no apparent conspiracy to collaborate to produce a particular outcome in this instance. The numerous and diverse responsibilities of the office of the Attorney General make its presence far-reaching in the state's business but do not impugn the reputation of the office or its employees. Merely because two individual attorneys, both classified as assistant AGs, are involved at some level in the same matter does not rob the proceedings of the crucial appearance of fairness. Georgia Gulf, 96-1907 at 9, 694 So.2d at 177.
Nor do we find any offense to the third concern of Allen, namely the right to meaningful review. Georgia Gulf, 96-1907 at 10, 694 So.2d at 178. The proposed recommendation of the revocation of Mr. Lucky's license was heard by a Gaming Board Hearing Officer, who recommended revocation. The Board adopted this recommendation. After an appeal to the district court, the revocation was again heard by a hearing officer whose considered decision was for revocation. This decision was appealed to and heard by the entire Board. The nineteen page written decision of the Board affirmed the decision of the hearing officer. The record in this matter is exhaustive and complete, including the proceedings, testimony and evidence before the hearing officer at each of two separate hearings, the Board upon appeal, and the district court on two separate occasions. We have an adequate record containing numerous independent findings of facts, legal analysis, and conclusions of law. Our review of this matter, pursuant to the statutory scheme as set up in La. R.S. 27:26 and 49:965, is in no way impeded by a restricted record. Without either actual evidence of, or even the appearance of, impropriety by the individual assistant AGs and with no limitation by the record on our ability to review this matter, we find no merit to these assignments.

THE BOARD

Assignment of Error Numbers 8, 9, 10 and 11
Mr. Lucky's also asserts numerous errors concerning the Board. First, Mr. Lucky's contends the Board is improperly constituted and that any "action taken by the Board ... [is] invalid." Although this contention seems rooted in the appointment and terms of the Board members serving on the Gaming Control Board, Mr. Lucky's does not argue that the Board which met on January 20, 1998, and affirmed the revocation of Mr. Lucky's license did not consist of nine members as authorized by statute. See La. R.S. 27:11 A.
Moreover, the argument that the Board members' terms do not conform to the requirements of La. R.S. 27:11 C is unpersuasive. La. R.S. 27:11 C requires the terms of the Board members to be staggered, with the expiration of three members' terms on June 30, 2000, two on June 30, 2001, two on June 30, 2002, and two on June 30, 2003. Even if the Board members' terms do not conform to the statutorily required term lengths, on the face of the statute no current members' term has expired. Mr. Lucky's can show no prejudice by asserting a possible future term length violation by a member of the current Board. This assignment is without merit.
Next, Mr. Lucky's argues the entire Board never considered the entire record of this matter before taking action. In support of this argument, Mr. Lucky's alleges the Board only considered a summary or "proposed decision", prepared by assistant AGs assigned to assist the Board.
The written decision by the Board referenced the Board's prior review of the record from the first hearing before Hearing *439 Officer James, included the introduction of the record from the first administrative hearing, and referenced additional evidence offered by Mr. Lucky's at the second hearing before Hearing Officer James. In addition, the lengthy and considered written decision evidences an understanding of the issues presented and a comprehension of the facts and evidence before the Board.
Moreover, it is often standard practice for agency staff members to prepare opinions adopted by the agency. While this practice may be the subject of criticism, it can easily be defended in this instance as necessitated by the heavy administrative work load and the time constraints faced by the Board upon its creation and its delegation as the sole and exclusive regulatory and supervisory board for gaming operations and activities in the state. See La. R.S. 27:31. As one often cited scholar has observed,
The objection to the separation of deciding from opinion writing may be unanswerable except in terms of inevitability. No one has yet conceived a system which will dispose of the quantity of adjudication, without an undue diversity of results, and will at the same time permit the deciding officers to write their own opinions.... The best solution of the Board's problem is probably the one the Board has worked outthe use of assistants.
K. Davis, Administrative Law 239 (1972).
Gulf States Utilities Company v. Louisiana Public Service Commission, 578 So.2d 71, 82-83 (La.1991), cert. denied, 502 U.S. 1004, 112 S.Ct. 637, 116 L.Ed.2d 655 (1991). This unsupported allegation is without merit.[6]
Mr. Lucky's also asserts it received disparate treatment from the Board, arguing other licensees in violation of fuel sales requirements did not suffer a revocation of their licenses. In support of this argument, Mr. Lucky's offered the fuel sales records of other licensed truck stops that failed to sell the required amount of fuel without revocation of their licenses.
Equal protection under the Fourteenth Amendment requires that state action affect alike all persons and interests similarly situated. Petition of Sewerage and Water Board of New Orleans, 257 La. 716, 725, 243 So.2d 809, 813 (1971). However, the conditions and factual situations relied on by Mr. Lucky's do not support its claim of unequal protection for similarly situated persons. In one instance, the truck stop's fuel facilities were padlocked by the fuel distributor, not voluntarily removed by the owner. In others, the truck stops merely missed the target amount of fuel sales; they did not fail to sell any fuel. These dissimilar situations presented different issues and problems to the various authorities charged with gaming enforcement.[7] Moreover, any past lax or dissimilar enforcement of state regulations, in the absence of a showing of an intent to discriminate, does not render present correct application of the regulations a denial of equal protection. Sewerage and Water Board, 257 La. at 728, 243 So.2d at 814. Mr. Lucky's has not shown the intent required by the equal protection provision of the Fourteenth Amendment.
No other truck stop's failure to sell the required amount of fuel was the result *440 of that truck stop's voluntary termination of its fuel contract and the removal of its dispensing equipment. As such, it cannot be said that such truck stops were similarly situated and that Mr. Lucky's was denied equal protection under our law. The differing facts and circumstances of the matters concerning other truck stops relied on by Mr. Lucky's nullify its claim to disparate treatment. The treatment received by Mr. Lucky's was not unfair or unequal. This assignment is without merit.
Lastly, Mr. Lucky's assigns as error the Board's failure to supplement the record with an investigative report prepared by P. Raymond Lamonica relating to the commingling of functions within the office of the Attorney General. Mr. Lucky's also includes in this argument other instances when it alleges erroneous evidentiary rulings were made.
During the remanded hearing before Hearing Officer James, Mr. Lucky's attempted to proffer testimony concerning the veracity of testimony given by a witness before the district court and evidence relating to the make-up of the Board. The district court had specifically remanded this matter back to the hearing officer for a hearing to afford Mr. Lucky's the opportunity to present evidence of ex parte communications between assistant AGs assigned to the Attorney General's Office, assistant AGs functioning as prosecutors before the Board, and assistant AGs assigned to assist the Board. The hearing officer limited the testimony to the issue of possible ex parte communications between and/or improper influence of these assistant AGs. Although Mr. Lucky's attempted to introduce and, in fact, proffered testimony and evidence concerning others issues, the hearing officer properly limited the testimony and evidence to the issues for which the district court had remanded the matter. See La. R.S. 27:25; La. C.C.P. art. 1631. These assignments are without merit.
Concerning the Lamonica report, we find no error in the failure to allow supplementation of the record. In brief to this court, Mr. Lucky's again focuses on the alleged lack of veracity of testimony by a witness before the district court and states the report "directly correlates with the testimony of [the witness]". If the importance of the report was the issue of whether or not there were ex parte communications or improper influence, we might be persuaded. However, to argue the need to supplement the record with information pertaining to other issues that were not properly before the hearing officer, the Board, or the district court is not compelling. This assignment lacks merit.

CONCLUSION
For the foregoing reasons, the judgment of the district court is affirmed. All costs of this appeal to be paid by appellant, J. Manoco, Inc., d/b/a Mr. Lucky's Truck Stop.
AFFIRMED.
NOTES
[1] While we note Mr. Lucky's petition for review to the district court includes a claim of lost revenues, the record includes no evidence upon which we could base an award concerning this issue. The record does contain the following testimony by the owner of Mr. Lucky's, John C. Mangano, Sr.:

Q. Now, with respect to revenues at your truck stop facility, can you describe for us the loss of revenues that you have personally sustained?
A. I'm not sure of the total amount that I've personally lost. It's a considerable amount. Based on the records from the state police, it's somewhere in the neighborhood of about $20,000 a week in gross revenues. I accepted the fact that Baton Rouge voted video poker out. I had two years to gear down.
In addition, the record contains testimony by Wayne J. Bienvenu, the bankruptcy trustee of LRO, given on April 11, 1997, before the hearing officer. Mr. Bienvenu stated during one twelve-month period, LRO averaged $100,000.00 per month after payment of expenses.
However, Mr. Bienvenu stated that at the time of the hearing, revenues had declined and "probably generate 10 to $20,000 a month."
The record contains no other testimony, nor any financial data or statements, upon which we could base an award for lost revenues.
[2] While this numbered assignment identifies this error as the refusal of the Board to consider Open Meeting Law violations, Mr. Lucky's brief, in fact, argues the action of Chairman Hillary J. Crain on June 19 suspending Mr. Lucky's license violates the Open Meeting Law. We will address the issue as raised in Mr. Lucky's argument.
[3] Rule 104 provides:

A. The Chairman is authorized to exercise all powers and authority of the Board except that the Chairman shall not:
1. enter into contracts in excess of $100,000;
2. adopt rules;
3. enter into the casino operating contract on behalf of the Louisiana Gaming Control Board;
4. issue a riverboat gaming operator license, provided that the chairman may determine that conditions imposed on a conditionally licensed riverboat gaming operator have been met;
5. approve changes of the berth or design specifications of a riverboat; or
6. approve transfers of ownership interests in a riverboat gaming operator licensee, the casino gaming operator, or a qualified video poker truck stop facility.
B. Any decision, order, or ruling of the Chairman exercised pursuant to the provisions of this Rule shall be subject to veto as provided by the Louisiana Gaming Control Law, 1996 Acts, First Extraordinary Session, Number 7, enacting R.S. 27:1 et seq.
[4] Pursuant to 1997 Acts, No. 1076, § 1, effective July 14, 1997, Gaming Control Board Hearing Officers now issue a decision that is appealable to the Board. All appeals from any decision of the Board are to the Nineteenth Judicial District Court. See La. R.S. 27:25 and 26.
[5] Mr. Lucky's alleges at length it was prevented from presenting evidence of multi-faceted representation by the office of Attorney General; however, the district court stated, on September 9, 1997, that it found no evidence of ex parte communications between various assistant AGs in an attempt to influence one another, and specifically remanded this matter back to the Hearing Officer for a hearing at which Mr. Lucky's could offer evidence of such improper communications or influence. All the witnesses contradicted Mr. Lucky's allegations. The Hearing Officer found as a finding of fact that "[n]ot one scintilla of evidence was produced to establish improper exparte [sic] communications at any level".
[6] Mr. Lucky's also includes within this argument an allegation that it did not receive proper notice of its appeal to the Board that occurred on January 20, 1998. However, the record clearly establishes that counsel for Mr. Lucky's was in attendance and participated in the appeal before the Board. Mr. Lucky's cannot now argue it was prejudiced when it was present and failed to object at the time of the hearing before the Board.
[7] The Louisiana Gaming Control Board, the exclusive regulatory and supervisory authority in the instant matter, replaced all other previous gaming regulatory entities, some that were involved in the matters relied on by Mr. Lucky's. See La. R.S. 27:31.